**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| MATTHEW THOMAS, JR., KRISTINE THOMAS, AND MATTHEW THOMAS SR. | ) ) ) ) | |
| **Plaintiffs** | ) ) ) | |
| v. | ) ) | C.A. No. 1:16-CV-11689-PBS |
| TOWN OF CHELMSFORD, CHELMSFORD SCHOOL COMMITTEE, FRANK TIANO, SCOTT MOREAU, BRUCE RICH, CHARLES CARLIRI, JEFFERY DOHERTY, ANTHONY SIRAGUSA, MICHELLE KENDER, and MICHAEL MOEs 1-4 | ) ) ) ) ) ) ) ) | **Leave to File Memorandum Exceeding Twenty Pages Granted: February 28, 2017** |
| **Defendants** | ) ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE MOTION TO DIMISSS**
**FILED BY THE CHELMSFORD SCHOOL COMMITTEE**
**AND TOWN OF CHELMSFORD**

**INTRODUCTION**

This action involves various federal and state claims where the Plaintiffs seek education reimbursement costs and money damages against all Defendants relating to events that occurred at a school sponsored football camp in August 2013 including the sexual assault and forcible rape of Matthew A. Thomas Jr. ("Matt") by K.M., G.C. and Z.D; its aftermath; various subsequent acts that were committed against the Plaintiffs during the 2013/2014 school year and continued after Matt transferred. The Plaintiffs were bullied, harassed and retaliated against for reporting the crimes against Matt to law enforcement for prosecution where the criminals were star athletes and/or students closely tied to the Town of Chelmsford ("Town") and its public

1

schools. The Defendants, their family members, friends and others conspired in a smear campaign to defame, discredit and inflict emotional distress on the Plaintiffs by publishing false statements and/or materially mispresenting numerous events to others including law enforcement and the media. The Defendants intentionally and maliciously controlled, influenced, manipulated, intimidated, coerced Chelmsford High School ("CHS") teachers, CHS students and the Chelmsford community by: 1) claiming the incident was of "a very juvenile nature" where "boys were just being boys"; 2) denying the rape occurred and 3) blaming the Plaintiffs and attacking their credibility. At the time of the rape, Matt and his assailants were juveniles and rising sophomores. In a nutshell, due to Defendant's policy, practice or custom of its "sports culture" Matt was violently raped that the Defendants' "whitewashed" it and then bullied, harassed and retaliated against the Plaintiffs after they reported the matter to law enforcement for prosecution where CPS targeted and encouraged students to do the same and harass and call the sexual assault victim a liar in order to intimidate him and his family into dropping the criminal investigation. All of which resulted Matt's ever-increasing hellish 2013/2014 school year for him and his family that forced Matt into dropping out of CHS at the close of the school year.

## II.     STATEMENT OF FACTS[1]

### Background

The Town and the Chelmsford School Committee ("CSC") are governmental entities under M.G.L.c.258. First Amended Complaint ("Complaint"), ¶¶5-6. The Town's school department, Chelmsford Public Schools ("CPS") is a Title IX educational institution and subject

---

[1] While "alternative facts" may be in vogue for some, they have no place in a motion to dismiss. In both Memoranda, the Defendants repeatedly misstate, mischaracterize and misrepresent the facts, reasonable inferences and theories of the Complaint. Examples of false facts include "every single incident that came to the Football Coaches' attention during the Camp was dealt with swiftly and effectively" Memorandum of Town, page 6; "Thinking he was dealing only with disrespect for Matthew's property...forced the perpetrator to apologize to Matthew", Memorandum of Individual Defendants at 9; Plaintiffs' claim of Matt being forced to transfer from CHS was "voluntary." Id. at 20; and ignoring most factual allegations. All such inaccuracies must be disregarded in the context of reviewing their motions to dismiss.

to the Individuals with Disabilities Educational Act ("IDEA"). ¶¶30-31. At all relevant times, defendants Superintendent of Schools Frank Tiano ("Superintendent Tiano"), CHS Principal Charles Caliri ("Principal Caliri"), Dean Jeffery Doherty ("Dean Doherty"), football and wrestling coach Bruce Rich ("Coach Rich"), Athletic Director Scott Moreau ("AD Moreau") teacher Anthony Siragusa ("Teacher Siragusa"), teacher Michelle Kender ("Teacher Kender"), teacher Benjamin Cole ("Teacher Cole") and the Michael Moes, collectively "Individually Named Defendants") were employed by the Town and acting under color of law as where other Town employees not named in his or her individual capacity. ¶¶5, 7-15. CSC supervised Superintendent Tiano, who supervised CPS and where AD Moreau and Principal Caliri reported to him. ¶¶6-7. Principal Caliri supervised CHS where Dean Doherty and all teachers directly reported to him. ¶8.

In September 2012, Matt entered CHS as a freshman who had an Individual Educational Program ("IEP") and was entitled to a free appropriate public education. ¶¶30 and 123.

**Massachusetts Law and CPS' Policies and Procedures**

Under the Massachusetts Declaration of Rights, all children in Massachusetts have a constitutional right to a free public education. ¶260. Hazing has been illegal in Massachusetts since 1985. ¶20. In May 2010, Massachusetts enacted G.L.c.71, §37O ("Anti-Bullying Law") that required CPS to create a Bullying Intervention Plan ("BIP") and included requirements on reporting bullying or retaliation; investigations; intervention; procedures and training for all school personnel; restoring a victim's sense of safety and assessing needs for protection; strategies to protect individuals who make reports; parental notification; and a strategy for providing counseling services or referrals to bullies and their victims. ¶21. Massachusetts also required CPS to prohibit bullying as a school policy and promulgate regulations regarding the

Anti-Bullying law. ¶¶22-23. As of July 1, 2013, the Anti-Bullying law included "school staff" in the definition of perpetrators in the bullying of students. ¶38.

In the fall of 2010, CSC approved its BIP and claimed it "will not tolerate" unlawful or disruptive behavior at any school or school-related activities and will "take prompt action" to "restore a target's sense of safety" and promulgated policies and procedures to follow. ¶¶25-26. In early 2011, the CPS and the Chelmsford Police Department ("CPD") entered into their latest Memorandum of Understanding ("MOU") to further protect children from criminal acts in order to have a safe learning experience where the MOU set forth policies, procedures and requirements for bullying, retaliation and education for students and staff and included mandatory notification to CPD and/or the Middlesex District Attorney's Office ("Middlesex DA") for criminal activity. ¶¶27-29.

### Chelmsford's Sports Culture and Conspiracy

Since at least 2009, the Town, the Chelmsford School Department a/k/a Chelmsford Public Schools ("CPS") and CHS through AD Moreau, ¶¶5, 17-19, 34, 39, 40, 59-62, 97, 113, 114, 134-140, 150, 167, 189, 194, 199-206, 227-230, Coach Rich, ¶¶5, 17-20, 24, 34-36, 39-45, 51-54, 57-63, 130-131, 159, 189, 194, 199-206, 227-230, embraced, taught and displayed a sports culture that put winning ahead of everything else where the Defendants encouraged their athletes to bully, harass, hurt and attempt to injure each other under the guise of 'team building' so male athletes could become men tough enough to play sports for Chelmsford and win championships where the rules do not apply to star athletes including but not limited to K.M., his brother S.M., G.C., Z.D., E.S. (son of Assistant Lacrosse Coach Keith Stone ("Coach Stone"), G.M., R.C., P.K., J.D. and G.M.. ¶¶32-36, 39-53, 60. 64-65. 68-75. 77-78. 81. 83, 88, 100-101, 104, 107-108, 127-131, 134-142, 144, 149, 151-153, 157-162, 164, 176-177, 189, 194-195, 200,

202-205, 209, 213-215, 226-227, 229. Such bullying and hazing occurred at the 2009 and 2010 football camps during practice conditions under the supervision of CPS personnel where there was no adult supervision and where Coach Rich insulted a parent who was upset with such offense activities. ¶¶19, 20, 24. That parent also informed Superintendent Tiano of the bullying/hazing at past football camps where he did nothing. ¶95. The "sports culture" was a policy, practice or custom of the Defendants, the Town and the CSC. ¶235.

CHS coaches who follow AD Moreau, Coach Rich and the CPS policy, practice or custom of this "sports culture" include: Assistant Football Coach and current CSC member Salvatore Lupoli ("Mr. Lupoli"), ¶¶17-19, 39, 208, 211, 214, 215 and 227; Lacrosse Coach Thomas Gallagher ("Coach Gallagher"), ¶¶17-18; 36-37, 138-142, 157, 159-162, 209, 230; and Coach Stone, ¶¶17-18, 32-37, 138-142, 157, 159, 209, 230. This "sports" culture was known and condoned by the Town, CSC and Superintendent of Schools and embraced by Chelmsford's Pop Warner football and Youth Wrestling programs and included Mr. Lupoli, a prolific cheerleader/fundraiser. ¶¶17-18. K.M.'s father, Scott McQuaide ("Mr. McQuaide"), is similarly involved and associated with CHS's wrestling team. Id. Incidents where the Defendants condoned bullying/ hazing and inappropriate conduct and failed to follow their own policies, procedures, practices, and requirements including: the 2009 and 2010 football camps, ¶¶19, 20, 24; the October 2012 "forced urination of Matt's cleats, ¶¶32-37; the fall 2012 S.M."file cabinet defecation" ¶¶36-37; the August 2013 events at Camp Robindel, ¶¶39-53; the twenty four (24) reported incidents to CPS involving the bullying, harassment, threats and assaults against Matt during the 2013-2014 school year by students and teachers and the lack of any or appropriate discipline against either, ¶¶77, 81-83, 88, 103-106, 108, 111-115, 120, 122, 126-129, 138-140, 142, 144-145, 151-154, 157-165, 168-174; and the "white washing" of Camp Robindel and/or

public shows of support for Matt's assailants and continued harassment of the Thomas family after the 2013/2014 school year. ¶¶74-75, 85, 116-117, 130, 137-142, 157, 159, 176, 177, 184, 195, 197, 199-205, 209, 213-215, 218-222, 228-230. The most egregious symbol of Chelmsford's "sports culture" was the naming of K.M. as captain of Coach Rich's wrestling team and being honored as an exemplar of a MIAA student athlete given his New Hampshire ("NH") status and his actions against a fellow athlete over the past year. ¶¶202, 205, 228.

The Town and CSC were well aware of the "sports culture" when shortly after the rape, CSC member Nicolas DeSilvio ("DeSilvio") told Mrs. Thomas that it was "criminal" and "beyond disturbing" and he recommended that she "evaluate this well beyond the athletic department because nothing will really get done" yet Mr. DeSilvio never addressed this issue at any CSC meeting during his tenure on the board, ¶¶56, 94, 182, 184, 197, and where his child later benefited from this culture. ¶¶226-227. Similarly, CSC Chair Michael Rigley ("Chairman Rigley") also knew those facts and what was happening to Matt during the 2013/2014 school year, promised to do whatever he could, yet did nothing and bring this to the CSC. ¶¶133, 182, 184, 197. This "sports culture" conspiracy also resulted in CPS publicly and privately stating to the media and alumni newsletters to describe Matt's rape as "a very 'juvenile' nature" where CPS handled it properly and the team "successfully moved past it." ¶¶86, 116, 117. This culture coupled with teachers and students bullying and harassing Matt with impunity resulted in the hostile educational environment for the 2013/2014 school year where even Matt's friends told Matt he was lying would in trouble and/or arrested for making false statements. ¶¶118, 121.

As set forth above, the sports culture was embedded before and after August 2013. In December 2013, a newspaper article on CHS wrestling featured a picture of K.M. with Coach Rich opining that "a few kids who are two and three sport athletes…" where K.M., Z.D. and

other harassers: R.C., ¶¶104, 108, 200; and P.K., ¶¶88, 164, 176-177, 200arity); were either returning starters or promising new comers. ¶130. Most of the students who bullied Matt were lacrosse players, wrestlers and/or football players: K.M., Z.D., G.C., R.C., P.K and J.D., ¶¶157-161. The "sports culture" continued after Matt transferred and allowed football players such as the children of Mr. Lupoli, Mr. DeSilvio and the Vecchiones (nephews of AD Moreau) to play in the Thanksgiving Day game after athletes were at a party where a CPS official informed CPD that there would be no discipline. ¶¶167, 226, 227. This "sports culture" allowed CPS to have a deep and talented wrestling team that went undefeated where two-time captain K.M, G.M., P.K. and R.C. were recognized as all-stars and Coach Rich was Coach of the Year and who publically praised K.M. as "the absolute leader of our program" where the goal "is to get the state championship every year" and "depth" and "quality" athletes are necessary. ¶228. The team received accolades and a police escort that made K.M. "feel like a big man on campus." Id. In 2016, during a Central Catholic-CHS football scrimmage, CHS players taunted and harassed Matt, calling him "pussy" and refused to shake his hand telling him to fuck off in violation of MIAA rules. ¶228.

### Rape in August 2013, CPS and Criminal Investigations and Disposition

Over four days in August 2013, CPS ran its annual football camp, there was no adult supervision in the bunkhouses as the adults were either offside or riding jet skis and/or drinking beer where the student, left on their own, devolved where Matt: was slapped in the face with powder; had his food and iPod stolen; was pelted with milk in a bathroom; and was picked up by his underwear. ¶¶39-42, 49, 54. His reports to Coach Rich and Coach Michael Marshall did nothing to stop such incidents where the coaches never told the students to stop or behave appropriately. ¶¶43-44. Given this, it was entirely foreseeable, especially given the past incidents

between Matt and K.M. where Coach Rich knew K.M. was "trouble" that Matt could be forcibly rape over twenty (20) minutes by Z.D., K.M., the leader, and G.C., among others where they dragged him into a shower, restrained him and ended up shoving the end of a broomstick into his anus while Matt was screaming and the students in the open air cabin were loud and animated. ¶¶46-48. Matt feared for his life and decided the best thing to do was pretend nothing happened yet later, again, without adult supervision, he was sexually assaulted when K.M. restrained Matt's chest, exposed his genitalia and rubbed his testicles on Matt's chin while the students laughed. ¶¶48, 50.

While Matt did not tell his parents about this, he told them about some of incidents where father headed to the camp until Coach Rich called and told Mr. Thomas he wanted to handle the issues himself where K.M., "apologized" after berating and calling Matt a liar. ¶¶51-52. Coach Rich told Mr. Thomas that K.M. was one of his "special players" who needed to play sports to stay out of trouble. ¶53.

On Sunday, August 25th, after learning of the rape, the family informed Coach Rich of the sexual assault and how Matt had been targeted and in a later conversation, Mrs. Thomas blamed Coach Rich as there was no adult supervision and his knowledge of the past incidents and Coach Rich apologized and did not dispute her claims. ¶¶57-58.

By early Monday morning, August 26, 2013, AD Moreau and Principal Caliri knew about the matter and AD Moreau told Mrs. Thomas not to report this matter to police that CHS would investigate and a meeting was set up; a meeting AD Moreau failed to attend. ¶¶59-61. While waiting, Coach Rich told Matt what happened was just a "part of growing up" and walked away after Mrs. Thomas vehemently objected. ¶¶61-62. The family met with Dean Doherty and others, told them about the incidents and their worries as it involved the 'legendary" Coach Rich

while notes were taken, the family was not told this was part of any investigation; they were only told not to speak to anyone. ¶¶62-63. CPS did not report this incident to law enforcement and conducted its own investigation with untrained personnel and only reported the matter after completing its own investigation where assailants were allowed to give unrepentant statements stating it was all lies, ridiculous and they actually taught Matt a lesson. ¶¶64-65, 68.

On August 27th, due to the relationships the juveniles, their parents and school officials had with certain CPD officers, instead of going to morning football practice, Matt and his family reported the crime to a City of Lowell Police Department ("LPD") detective who immediately referred the violent rape of a child to the Middlesex DA's Child Abuse Unit and reported the rape of a child; who in turn reported it the Moultonborough Police Department ("MPD") and arranged a child sexual assault victim Sexual Assault Interview Network ("SAIN") interview. ¶¶66-67.

On August 30th, CPS prepared a report that found only that juvenile behavior had occurred though acknowledging that Matt had been assaulted with "a broomstick in the upper thigh and buttock area" though the report did not include any information as to how the incidents occurred. ¶¶74-76.

Days after reporting the matter to the police, a conspiracy started between the Defendants, named and unnamed, and the assailants where Matt was called a liar and his allegations deemed false and social media was abuzz over this and someone created a fake account under Matt's name and G.C. told people to "stop talking". ¶¶66, 69, 72, 73, 77. A similar conspiracy with the Defendants, named and unnamed, where CHS teachers would bully, harass and retaliate against Matt claiming he was a liar and troublemaker in an effort to alienate and marginalize him by making his school and educational experiences horrible while Teacher Cole

was teacher's union president where he was able to influence, encourage or support Teachers Siragusa and Kender to discredit and alienate Matt in an attempt to make the criminal case go away and force Matt to leave CHS. ¶70.

Once the story broke, it was repeatedly described by the Defendants and conspirators as being of a "juvenile nature" despite CPS having actual knowledge of the rape. ¶¶69, 85, 116, 117. Law enforcement personnel viewed the incident as a serious sexual crime where the victim was a minor, ¶¶66-67, 84, 113, and had concerns about CPS' credibility given its inability to be available for interviews. ¶97. While MPD was investigating, CHS teachers were falsely telling persons the criminal case went away and Matt made everything up; despite the fact that K.M., G.C., Z.D. and their parents, including Teacher Cole knew these statements were false and charges that reflected of the crimes were looming. ¶¶132, 143.

On April 16, 2014, NH actions were taken against Z.D., K.M. and G.C. that CPS, Superintendent Tiano, Principal Caliri, Dean Doherty and AD Moreau were aware of but did not comply with those actions or create a safety plan for Matt. ¶¶146-148.[2] Superintendent Tiano did not inform CSC of these events. ¶¶150 and 152.

In May 2014, the Thomas family was in communication with NH regarding what was fair and concerns NH had with CPS officials. ¶¶166-167. In July 2014, Superintendent Tiano and Principal Caliri did not comply with the NH order or MA law regarding Matt's confidential school records where the family had not authorized such disclosure. ¶¶179, 186-187.

In August 2014, the matters in NH involving K.M. Z.D. and G.C. were resolved and CPS, Principal Caliri, Mr. Lupoli, AD Moreau, Coach Rich, the Vecchiones and others knew how the matters were resolved and which precluded any doubt as to what happened. ¶¶189-196.

---

[2] As the NH matters are under seal; these specific facts are not set forth in this document. The Plaintiffs' rely on their pleadings. ¶¶146-148, 152, 166-167, 179, 186, 189-196, 204.

**The 2013-2014 School Year**

During the 2013/2014 school year, CPS repeatedly promised the Thomas family that they would protect Matt; he would be safe and they were taking steps to do so; CPS failed to take any measures to protect Matt and his friends despite the Thomas family reported at least twenty four (24) incidents, ¶169 including: M.M. broomstick; M.C. broomstick; C.T., N.S.J. and G.M. – pole up ass; ¶¶78-83; Teacher Siragusa – translate Matt and Camp Robindel,  ¶¶103-106; R.C. – broomstick, ¶104; R.C. – broomstick, ¶108; Teacher Kender – instigator Matt, ¶¶111-112; AD Moreau – swear at Matt, ¶113; two boys "like rape – do it again" comment, ¶120; Teacher Kender IEP issues, ¶¶122-126; K.M. and G.C. March lacrosse tryouts, ¶¶134-142; Z.D. April hang around, ¶153; Teacher Cole – stares, ¶¶153-154; May 1st Z.D. gestures - ¶¶158, 162; May 1st J.D. – facemask "fucking kill you", ¶159; May 5th Teacher Kender – Matt "bad character", ¶¶163, 165; P.K. "take that shit off" assault, ¶¶164 and May 27th Matt "in the ass" bathroom, ¶168; and (25th incident) June 5th Kender fails Matt but gives 100 to his classmate for the report they submitted jointly, ¶¶171. CPS "yessed" the family but did nothing except claim everything that happened during the 2013/2014 year was unrelated to Camp Robindel and was just "boys being boys." ¶¶81-83; 98, 103-106, 108, 111-112, 115, l20, 127-130, 137-140, 144-146, 157-160, 162, 164. Additionally, Matt was forced to sit in class while one his rapist's name was called in two classes. ¶¶79-80. Despite Coaches Gallagher and Stone observing the taunting, bullying and threatening of Matt; they did nothing about it until after the family reported J.D's threat; where the acted by suspending Matt for two games. ¶¶134-142, 157-161. The first incident CPS reported was the May 27th "in the ass" bathroom scribble.  ¶¶168-170.

The public story claimed what happened was of "a very juvenile nature" where Superintendent Tiano praised CPS and how it handled the matter and concluded CPS has

"always and will continue to take seriously the safety of each and every student under our care."
¶¶85-86. What the Defendants were saying publically differed from what was actually happening where the family was unaware of any actions CPS was taking as it didn't speak to them. ¶87. After Superintendent Tiano's statements, family and friends of K.M. G.C. and Z.D. tweeted none of what happened was true. ¶88. CPS failed to keep Matt safe, despite Principal Caliri's promise that CPS would prevent the media from approaching students on campus and Matt ended up being hounded by a reporter after exiting the building as he wore a CHS football shirt where Dean Doherty commented after the fact, "They were not supposed to be. I guess no one was watching." ¶89-93.

On September 10th, CSC met for the 1st time since the story broke and other than reading a press release, CSC did not discuss or address the issue. At no time during the 2013/2014 or 2014/2015 school years did CSC discuss this incident; it never inquired, asked or requested information about Camp Robindel; how the victim and his family were doing; or what steps were implemented to prevent future incidents. ¶¶94, 110.

CPS and CHS repeatedly failed to provide Matt the protections they said they would including adult hall monitors. ¶¶98, 100 and 102. Superintendent Tiano refused to provide information on how CPS would protect Matt but claimed CPS was following hazing and bullying guidelines, the family stated this was about sexual assault and rape. ¶100. The family's request that K.M., G.C. and Z.D attend the CHS annex was denied. ¶101.

On Friday, September 13th, in front of his Spanish class, Teacher Siragusa singled out Matt at the start of class which prompted Matt to leave and upon his return, Teacher Siragusa had his class translate phrase like: Matt went to football camp; Matt called his parents; and why did Matt call home; which prompted the students to laugh at Matt. ¶103. The family reported this as

Matt didn't feel safe where teachers were now bullying him; Dean Doherty stated Teacher Siragusa "feels badly for what had happened". ¶¶104-105. Previously CPS told the faculty about football camp and instructed them not to discuss it when Matt was around. ¶106.

On September 16th, K.M., Z.D., and G.C. returned to CHS without restriction or supervision and their acts were not reported to the MIAA and Matt had no safety plan or adult monitors as had been promised by Superintendent Tiano and Dean Doherty. ¶107.

On September 20th, despite the ten (10) reported acts of bullying/harassment committed by students and a teacher against Matt, ¶¶96-108, Superintendent Tiano failed to inform CSC of events saying there would be no comments in absence of "new information" to prevent "another news cycle…." ¶109.

On September 30th, Matt was harassed and bullied his Science teacher, Teacher Kender where she blamed him for two students who got into an argument where she took Matt into the hallway screamed and yelled he was "an instigator" who was "trouble"; she "was sick of it" and told him to be quiet; the Thomas family informed Dean Doherty about it who said he spoke to her and hoped there would be no future issues. ¶¶110-111.

In October 2013, AD Moreau yelled at Matt, "No Matt, get the hell out of the hallway and go back to your fucking locker room!" where Principal Caliri stated CPS that treats Matt just like any "other student-athlete[]" despite MPD's current investigation. ¶¶113-115. During the school year, Teacher Kender repeatedly bullied and harassed Matt by: questioning his study habits despite her not following Matt's IEP, ¶¶122-123.

Later in November, Teacher Kender watched a student hit Matt with a shoe in her class; walked away and appeared visibly happy; she did not speak to or discipline the student; Dean Doherty said he'd take care of it but did nothing. ¶126.

At no time, did CPS address Matt's IEP and educational issues despite his being raped by teammates during football camp where he had coping issues and was easily frustrated; where CPS did not followed his IEP; when the issue of Matt's study habits was raised with Dean Doherty, instead of recommending a new IEP or following the current one; he offered a classmate as a tutor. ¶¶123-125.

In November and December 2013, K.D. was constantly harassing Matt's friends at school (inappropriate comments, sexts and grabbing a female student's buttock, and repeatedly threatening a male student) where her parents met with to CPS and Dean Doherty and explained how Z.D.'s acts related to the criminal cases and how they were targeted due to their friendship with Matt. ¶¶127-128. CHS denied Z.D.'s actions related to Camp Robindel and said there was nothing the school could do to but it would assign Z.D. an escort. ¶128. Teacher Kender told CHS that Z.D. and female student were friends as she saw them together; claims that family said were not true. Id. CHS took no action on Z.D. ¶129.

During March 2014, AD Moreau failed to timely answer the family's various inquiries and pleas as how CHS would keep Matt safe from K.M. and G.C. during lacrosse season. ¶¶134-136. AD Moreau finally responded by stating there was nothing to be done as the school determined K.M., G.C. and Z.D. did nothing wrong though he promised adult supervisor in the locker rooms. ¶137. During lacrosse tryouts, K.M., and G.C. taunted and got others to taunt Matt in full view of Coaches Gallagher and Stone who did nothing to stop the taunting, illegal under MIAA rules. ¶¶138, 142. Mr. Thomas again voiced his concerns as he feared this would only get worse. ¶¶139-141. Thereafter, Coaches Gallagher and Stone treated Matt differently by riding him where he was in their "dog house" in from of their athletes which resulted in Matt not attending team dinners due to the bullying and harassment. ¶142.

In early April 2014, Z.D. resumed his inappropriate conduct against Matt's friends where he made sexually explicit to the female and threatened to send the male (a "fucking pussy") to the hospital where he'd eat from a tube; Dean Doherty told the male student to "man up" and play lacrosse as this was just "boys just being boys" and unrelated to Matt. ¶144. Dean Doherty told the same things to the boy's parent, who explained this was all about Matt and CPS was "trying to sweep everything under the rug" and was not addressing any of their safety needs and Z.D.'s acts were an attempt to help in the criminal case. ¶145. Despite the family provided CPS with documentation about Z.D.'s bullying was affecting the student; CPS did not do anything in response to this information. Id.

After April 16th and events in NH, the bullying and harassment of Matt increased in intensity and frequency where on April 29th with Z.D. called out Matt's name in the hallway and punched his hands together where CPS was aware Z.D. was not to be near Matt, ¶¶151-152, yet every day from April 28th to May 1st, Z.D. hung outside Matt's classroom and angrily stared at Matt as Z.D. loitered. ¶153. Z.D. also gestured for Matt to engage him on May 1st. ¶158. On April 30th, Teacher Cole approached Matt's friends, spoke with them but did not speak with Matt; instead he stared intently at Matt; prior to this date, Teacher Cole didn't interact with Matt or his friend; since the fall, he just intently stared at Matt, which Matt always took as intimidation which were reported to CPS but it nothing to stop these strange stares. ¶¶154-155. Outside of school, Teacher Cole told one of Matt's friends who was fishing, "It's better to have a pole in your hands than up your ass." ¶156.

During spring lacrosse, Matt was bullied and harassed by teammates in front of Coaches Gallagher and Stone who did nothing to stop it where teammates: told him he sucked; took themselves either out of drills or tried to hurt Matt during drills; cheered for cheat hits against Matt

and on May 1st, senior captain J.D. grabbed Matt by his facemask and yelled at him to either quit or he'd "fucking kill" Matt. ¶¶157, 159-160. After this incident was reported, Matt was suspended for two games by Coach Gallagher. ¶161.

On May 5th, Dean Doherty said there was nothing he could do against Z.D. despite Mrs. Thomas raising her concerns about the escalation of violence against Matt since April 16th. ¶162. This same day, Teacher Kender in front of her class berated Matt stating how he throws "people under the bus" that he had "bad character" and tells on people rather than speaking with them. ¶163. The follow day, May 6th, P.K. slapped Matt hard in the head, knocking his hat off and looking directly at Matt, said, "Take that shit off." ¶164. These incidents were reported to CPS, who did nothing but accept a poor excuse of an "I'm sorry for how you feel" non-apology from P.K. ¶¶165, 176-177. On May 27th, someone wrote "Matt Thomas likes it in the ass" on a bathroom wall that remained accessible for a day where CPS contacted CPD and Dean Doherty told the police that Matt was the victim of a pending "sexual assault." ¶¶168-170. On June 4th, the family learned that Teacher Kender failed Matt with a "54" when his partner got a "100" for the same project; Mrs. Thomas reminded Dean Doherty and Principal Caliri of the past problems with Teacher Kender who had been targeting Matt. ¶¶171, 174.

As CHS was neither safe nor adequately addressing Matt's educational/IEP needs – no one informed them about a reassessment given the rape and bullying and harassment, the family decided that Matt would attend Central Catholic and did so without telling CPS until the last minute where Dean Doherty told Mrs. Thomas he didn't "blame" them for transferring Matt. ¶¶172-173, 175, 178.

Due to the acts of the Defendants and conspirators, Matt was regularly afraid for his life and feared for his safety where he would leave class; call his parents; hide in the dean's office; a

hostile education environment was created; he did not receive his free public education; where Teacher Kender even undermined Matt's friends' complaints; this resulted in repeating his sophomore year. ¶¶78-80, 111-112, 120-128, 141, 163, 165, 171-174.

**Post 2013-2014 School Year Incidents**

On July 8, 2014, the CSC held a meeting where Superintendent Tiano was praised for how he handled the "alleged hazing allegations" where there "was no misunderstanding where [CPS] stood" despite the fact that CSC never discussed these topics and where Superintendent Tiano did not inform them of the July 3, 2014 information. ¶¶179-184. On July 10th, Superintendent Tiano disclosed for the first time to CSC the actual status of events in NH yet CSC did not follow up on this item. ¶185.

On September 25, 2014, during a sophomore Central Catholic – CHS football game AD Moreau forced Mrs. Thomas to leave the area although she was only one of several adults in the area while G.C., Z.D., P.K. and R.C., all not dressed, stood on the CHS sideline with Coach Rich in a show of solidarity and watched Matt. ¶¶199-200.

On November 21, 2014, CPS selected K.M. to represent CHS at the MIAA Sportsmanship Summit held at Gillette Stadium where CPS charted a bus and posted photos on social media which sickened the Thomas family to its core given K.M's status. ¶¶202-206. Given the events of September 25th and November 21st, the family feared for their daughter's safety if she attended CHS the following year. ¶207.

During an April 27, 2015 Central Catholic-CHS lacrosse game, K.M. hit Matt with a late cheap shot at the opposite end of where the play was; CPS knew K.M. and Matt would play in this game took no action against K.M. ¶209.

After the local newspaper published a story about the family's August 7, 2015 presentment letter without specifics (whose facts are incorporated into the Complaint, ¶289), Z.D. threatened another friend of Matt's who had posted a link to the story which was reported to CPS, where it did not find the written tweets and assault report after the student was assaulted by Z.D. to be credible. ¶213.

Despite knowing how the NH matters resolved a year earlier, now CSC member Mr. Lupoli, who ran on a campaign of accountability and transparency, Mr. Lupoli publicly stated all sides needed the chance to tell their story and the assailants should be considered "innocent until proven guilty" and shortly thereafter Mr. Lupoli posed for a photo with Z.D. and P.K. in their football uniforms that Z.D. prominently displayed on his social media. ¶¶208, 211, 214, 215. Soon afterwards, the local newspaper got an unredacted copy of the presentment letter prompting Lisa Vecchione, AD Moreau's sister, who knew the results of the NH matters, published the following statement, "The allegations were unfounded. Case closed" in response to an editorial asking Chelmsford to be transparent.¶¶167, 189, 194, 216-217.

By September 11th, two days before the newspaper printed any information about the contents of the August 2015 present letter, the McQuaide, Cole and the Hughes, guardians of Z.D. retained a spokesperson, Maria L. Santos, Esq., who since 2013 had been the President of a non-profit that supports Chelmsford Schools whose legal address is the CPS address and where CSC member Barbra Skaar is also on that non-profit, issued a press release denying the rape occurred, the victim had a history of credibility problems and that the school and teachers had done nothing wrong. ¶¶218-220. Thirteen months after the NH matters were resolved, after actual notice that such statements were false, the McQuaide, Cole and Hughes family attacked the Thomas family and fully supported "[CPS], coaches, teachers and students" where they were

confident that when "the facts are presented it will bring to light the serious lack of credibility and thus expose lies that have plagued these boys and the town for two years…" ¶¶221-223. For years, the McQuaide, Cole and Hughes families had threatened the Thomas family with violating laws if they ever spoke about what happened at the camp, the criminal investigation or how the matter resolved; instead of citing NH confidentiality laws, the families made false statements. ¶224. The McQuaides, Coles, and Hughes knew of the contents of the August 2015 presentment letter before they were published due to their conspiracies with the Defendants. ¶¶69-70.

As a result of their actions, the Defendants violated various legal obligations, state laws, state regulations, their own policies and procedures, MIAA policies including the claims cited in the Complaint, ¶¶225, 232-294, which resulted in injury and damages to the Thomas family including physical, emotional and psychological injuries where: Matt relives the events; his trust in friends, classmates and teachers was affected; he lost friends due to the conspiracies; he endured a horrible year of being bullied, harassed and retaliated against by the Defendants; his life, educationally and socially suffered; the Thomas family suffered great stress and arguments; it caused great pain, suffering and financial hardship including the cost of private education for two children; it forced Matt to leave CHS and his friends; and where the continued false statements have harmed the Plaintiffs' reputation and character. ¶231.

### III. ARGUMENT[3]

#### A.    Standard of Review

The Plaintiffs have alleged facts and reasonable inferences sufficiently plausible to survive the individually named defendants to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. Fed.R.Civ.P.12(b)(6). On a motion to

---

[3] The Plaintiffs also incorporate all arguments and facts as set forth in their other opposition Memorandum.

dismiss, the court must "determine [] if the well-pled facts alleged 'plausibly narrate a claim for relief." Williams v. Massachusetts College of Pharmacy and Allied Health Sciences, 2013 WL 1308621 at *3 (D. Mass. 2013), quoting Schartz v. Republican State Leadership Com., 663 F.3d 50, 55 (1st. Cir. 2012). "To state a plausible clams, a complaint need not contain detailed factual allegations but must recite facts sufficient at least to 'raise a right to relief above the speculative leave … on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" Pollard v. Georgetown School District, 2015 WL 5545061 at *1 (D. Mass. 2015) quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

At the pleading stage, a court "do[es] "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, at 570. The Plaintiffs' "obligation is to provide the 'grounds' of [their] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. The Court is required to "accept as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011). "On the plaintiff's view of the facts, the Court should be able to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Williams, 2013 WL 1308621 at *3, quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "'The probability standard' is not akin to a 'probability requirement' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Williams, 2013 WL 1308621 at *3, quoting Iqbal, 556 U.S. at 678, quoting Bell Atlantic Corp., 550 U.S. at 556 ("Asking for plausible grounds to infer [a cause of action] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [acts]"). Rule 8(a)(2)'s short and plain

statement language does not require or mandate specific facts as the statement only "give the defendant fair notice of what the…claim is and the grounds upon which it rests" continued after Twombly. Erickson v. Pardus, 551 U.S. 89, 93 (2007) quoting Bell Atlantic Corp. v. Twombly, at 573. A pleading need only contain enough to allow the court and the defendant to understand the gravamen of the plaintiff's complaint. See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 164 (1993). A court must construe pleadings "so as to do justice." Fed.R.Civ.P.8(e).

In determining whether a complaint crosses the plausibility threshold, "the reviewing Court [must] draw on its own judicial experience and common sense." Garcia-Catalan v. United States, 734 F.3d 100, 103 (1st Cir. 2013). However, the Court's "task is not to decide whether [the Plaintiffs] ultimately will prevail but, rather, whether [they are] entitled to undertake discovery in furtherance of the pleaded claim[s]." Rodi v. S. New England Sch. of Law, 389 F. 3d 5, 13 (1st Cir. 2004). A well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). The issue when considering a motion to dismiss "'is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible.'" Evergreen Partnering Group, Inc. v. Pactiv Corp., 720 F.3d 33, 45 (1st Cir. 2013) (quoting Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162,189 (2d Cir. 2012), cert. denied, 133 S. Ct. 846 (2013)).

Where the Court believes additional facts can and should be pled, it may dismiss claims without prejudice. See Pollard v. Georgetown Sch. Dist., No. 14-cv-14043-DJC, 2015 U.S. Dist. LEXIS 125099, at *24-25 (D. Mass. Sept. 17, 2015); Williams, 2013 WL 1308621 at *9.

While the standard before the court is a notice "heft" plausibility pleadings standard, it appears the Defendant are proceeding on a summary judgment standard claiming the lack of specific evidence or pleading of particular facts. The Plaintiffs have pled sufficient specific information to survive the Defendants' motion to dismiss to warrant this case to proceed to the discovery phase.[4]

**B.      The Plaintiffs' Properly State 42 U.S.C. §1983 Monell Claims Against the Municipal Defendants (Count I)**

The §1983 statute "must be broadly constructed" as it is "compelled by the statutory language, which speaks of deprivations of *any* rights, privileges or immunities secured by the Constitution and laws." <u>Dennis v. Higgins</u>, 498 U.S. 439, 442 (1991) (citations and quotations omitted) (emphasis in original).

1.      <u>The Plaintiffs Plead Sufficient Facts to Establish a Policy, Custom, or Practice and Deliberate Indifference to Support their §1983 Monell Claims Against the Municipal Defendants</u>.

A plaintiff stating a Section 1983 claim against a municipal entity for deprivations of constitutional rights must show the deprivations resulted from municipal custom, policy, or practice. <u>Monell v. New York City Dept. of Social Servs.</u>, 436 U.S. 658, 694 (1978). For a valid *Monell* claim, the custom need not be approved through official decision making channels. <u>Los Angeles Cnty. v. Humphries</u>, 562 U.S. 29, 36 (2010) (citations and quotations omitted). Where the policy or custom inflicts the injury, claimants may assert *Monell* claims. Id. The municipality cannot claim a qualified immunity defense to its own constitutional violations. <u>Haley v. Boston</u>, 657 F.3d 39, 51 (1st Cir. 2011) (citations omitted).

---

[4] Aside from their many inaccuracies on the Plaintiffs' pleadings for 'put on notice' claims required at this stage, the Defendants, seek to dismiss every single charge based on alleged failures of technical forms and inconsistencies, appear to be practicing law under the abolished formal common law pleadings practices that predate the Federal Rules of Procedure. These arguments violate Fed.R.Civ.P.8(d). Claims are to be simple, concise and direct where no technical form is required. Fed.R.Civ.P.8(d)(1). Claims may be set out 2 or more statements alternatively or hypothetically where a pleading is sufficient if any one of them is sufficient. Fed.R.Civ.P.8(d)(2). Plaintiffs may plead as many claims as it has regardless of consistency. Fed.R.Civ.P.8(d)(3).

"A plaintiff can establish the existence of an official policy by showing that the alleged constitutional injury was caused…by a person with final policy making authority." Welch v. Ciampia, 542 F.3d 927, 941 (1st Cir. 2008). Under the Massachusetts Educational Reform Act of 1993, "the ultimately responsibility" for hiring, firing and demoting public school teachers "resides….with the superintendents themselves[.]" Ciccarelli v. Sch. Dep't of Lowell, 70 Mass. App. Ct. 787, 792 (2007). A plaintiff must show that the policy, custom or practice is causally linked to the constitutional deprivation alleged. City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989).

"Unlike a 'policy,' which comes into existence because of the top-down affirmative decision of a policy maker, a custom develops from the bottom up. Thus, the liability of the municipality for customary constitutional violations derive not from its creation of the custom, but from its tolerance of or acquiescence in it." Britton v. Maloney, 901 F.Supp. 444, 450 (D.Mass. 1995). In establishing the existence of a custom for the purpose §1983, the Plaintiffs have established a practice so "permanent and well-settled as to constitute a 'custom or usage with the force of law.'" Armstrong v. Lamy, 938 F.Supp.1018, 1035 (1st Cir. 1996). A custom "must be attributable to the municipality" where it is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Whitfield v. Melendez-Rivera, 431 F.3d 1, 13 (1st Cir. 2005). The custom must also "have been the cause of and 'the moving force behind; the constitutional violation." Id. See Baron v. Suffolk Cty. Sheriff's Dep't, 402 F.3d 225 (1st Cir. 2005) (judgment affirmed against governmental entity where plaintiff had reported multiple incidents of harassment including physical threats and property destruction to three government and two union officials on "code of silence" custom tolerated by policymakers). The

constitutional violation can include failures to train, supervise or discipline employees, where the failure evidences deliberate indifference to the rights affected. Doe v. Fournier, 851 F.Supp. 2d 207, 221 (D. Mass. 2012). "Tolerance of unconstitutional conduct is tantamount to encouragement of such conduct and is therefore a basis for municipal liability." Foley v. City of Lowell, 948 F.2d 10, 14-15 (1st Cir. 1991) (internal quotation and citation omitted). In Foley, the plaintiff showed the police beatings were not isolated and were the "product of a municipal policy and custom of studied indifference to the violation of constitutional rights." Id. at 13. Actions occurring after the fact are relevant if "they provide reliable insight into the policy in force at the time of the incident" and "sufficient relates to the central occurrence". Id. (citations omitted). The "sports culture" continued after Matt transferred and includes: the various public shows of support for the assailants by CPS and its affiliates after the resolution of the criminal investigation over the years; the November 2014 K.M. selection as a captain and to attend the MIAA Sportsmanship Summit; his late cheap hit on Matt in April 2015, the August 2015 Z.D. threats, the November 2015 party and July 2016 CHS-CCHS football game. ¶¶ 166, 190, 192, 198-205, 209; 212-230.

The law has long recognized "the peculiar vulnerability of children" and "their inability to make critical decisions in an informed, mature manner." Bellotti v. Baird, 443 U.S. 622, 634 (1979). A municipality is bound to consider that young school children are "predictably irresponsible." Tyron v. City of Lowell, 29 Mass. App. Ct. 720, 722 (1991). For these reasons, juvenile criminals are prosecuted in separate juvenile proceedings. See generally, G.L.c.119, §§52-58. Given this, common sense dictates that children often make poor decisions and are influenced by peers, teachers, coaches and their parents and adults know these facts.

"To demonstrate deliberate indifference a plaintiff must show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) [defendant's] failure to take easily available measures to address the risk." Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998) (citations omitted). [D]eliberate indifference is a stringent standard of fault, requiring proof that a [state] actor disregarded a known or obvious consequence of his action." County Comm'rs of Bryan County Brown, 520 U.S. 397, 410 (1997).[5]

In the present case, the Plaintiffs' Complaint is littered with specific allegations of enough heft to set forth plausible theories sufficient to their Monell claims. Since at least 2009 the "sports culture" theory is the policy, practice or custom that the Town, CSC. Superintendents (plural – pre-Tiano, Tiano, post-Tiano), AD Moreau, Coach Rich and the others embraced, condoned and taught.[6] The Plaintiffs allege the municipal defendants did not follow their BIP, MOU or any law or regulation regarding hazing, bullying or criminal activity. ¶225, The Plaintiffs claims involve essential three 'discrete' times: Camp Robindel, the 2013/2014 school year and thereafter where the "sports culture" policy, practice or custom was the driving force, i.e., causation, for all of the family's injuries. At Camp Robindel, the Defendants were deliberately indifferent in how they ran their past football camps, the incidents in fall of 2012 where they knew of the animosity between the "trouble" K.M. and Matt where students are "predictably irresponsible" the Defendants had NO supervision at the Camp when the students were in the bunkhouses. In this "sports culture" boys needed to be tough to play for Chelmsford and the "Lord of the Flies" bunkhouse was foreseeable.

---

[5] The Plaintiffs further discuss deliberate indifference in its Section III.B. of their Opposition to the individual defendants motion to dismiss.

[6] Absent discovery, it is not possible to determine the exact genesis of the "sports culture" but it is clear the Plaintiffs have plead a plausible theory.

During the 2013/2014 school year, CPS did nothing to address the multiple grave risks that Matt suffered at the hands of peers and CPS personnel and where coaches allowed incidents to happen literally as they watched. When these incidents were reported, the Defendants did nothing and denied any nexus between the bullying, harassment and retaliation and the criminal case to Matt, his parents, his friends and their parents. After transferring to Central Catholic, the Defendants continued to inflict the Thomas family in numerous ways. Deliberate indifference is further shown in the fact that CSC despite having knowledge of Camp Robindel, the criminal investigation and resolution where individual CSC members knew what Matt was going through during the 2013/2014 never held a single hearing to discuss any issue yet gave Superintendent Tiano a raise for how he handled Camp Robindel and its aftermath.

Two cases cited and provided to the court by the Defendants support the Plaintiffs' position: Doe v. Bradshaw, No.11-11593-DPW (D. Mass. September 16, 2013) (Court denied municipalities motion to dismiss Doe's §1983 and Title IX claims for years 2008-2010 involving both students and state actors denied even though there was no record on the decision-making process.) and Lee v. Boston Public Schools, No.15-10811-LTS (D.Mass. February 1, 2016) (complaint alleging a "policy or custom of covering up allegations of sexual abuse of students by BPS employees" sufficiently plead a valid *Monell* claim as the defendants could understand the gravamen of the plaintiff's complaint.).[7] As the Defendants' caused the Plaintiffs' injuries where they have plead sufficient facts to show this "sports culture" policy, practice or custom is plausible; the Court should deny the request to dismiss the *Monell* complaint. See Evergreen Partnering Group, Inc., 720 F.3d at 45 (quotation omitted).

---

[7] Also, in Doe v. Bradshaw, the court noted the defendants relied on summary judgment cases and not motion to dismiss cases. See page 13.

2.     <u>For the Same Reasons Stated by the Plaintiffs in Their Opposition to the Individual Defendants' Motion to Dismiss, the Plaintiffs Sufficiently Plead Violations of the Plaintiffs Constitutional Rights.</u>

For the same reasons stated by the Plaintiffs in their Opposition to the Individual Defendants' Motion to Dismiss based on violations of Matt's (substantive Due Process, Equal Protection, "stigma plus" defamation and 1st Amendment rights (free speech and right to petition) as well as Mr. and Mrs. Thomas' 1st Amendment constitutional – free speech and right to petition) rights. Plaintiffs' Opposition to Individual Defendants Memorandum, III.C, pp.9-16.

**C.**     **<u>The Plaintiffs Properly Plead Sufficient Gender Specific Conduct to Support the Title IX Claim and Deliberate Indifference (Count II).</u>**

20 U.S.C. Sections 1681 through 1686 ("Title IX") prohibits discrimination based on same-sex Title IX harassment claims and are actionable. <u>Frazier v. Fairhaven School Committee</u>, 276 F.3d 52, 66 (1st Cir. 2002). The purpose of Title IX is to "avoid the use of federal resources to support discriminatory practice" and to "provide individual citizens effective protection against those practices in educational settings." <u>Cannon v. Univ. of Chicago</u>, 441 U.S. 677, 704 (1979). The statute is to be broadly worded. See <u>Jackson v. Birmingham Bd. of Educ.</u>, 544 U.S. 167, 179 (2005). "There is no doubt that 'if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language.'" <u>North Haven Bd. of Educ. v. Bell</u>, 456 U.S. 512, 521 (1982) (quoting <u>United States v. Price</u>, 383 U.S. 787, 801 (1966)). "Discrimination on the basis of sex is the sine qua non of a Title IX sexual harassment case." <u>Frazier</u>, 276 F.3d at 66. A plaintiff "'always prove that the conduct at issue was not merely tinged with offensive sexual connotations,' but in fact constituted discrimination 'because…of sex." Id. quoting <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998).

Sexual abuse is sexual harassment based on gender. See <u>Franklin v. Gwinnett County Pub. Sch.</u>, 503 U.S. 60, 75 (1992) (extending the workplace definition of sexual harassment as

discrimination based on gender to Title IX claims in school settings). The sexual harassment need not occur on school grounds to lead to Title IX liability. See Simpson v. University of Colorado Boulder, 500 F.3d 1170, 1173, 1185 (10th Cir. 2007) (denying defendants' summary judgement motion on a Title IX claim where the sexual assault occurred off campus).

When proceeding with the hostile environment theory, in order for an educational institution to be held liable under Title IX, a plaintiff must prove: (1) the educational institution is the recipient of federal funding; (2) the institution acted with deliberate indifference; (3) to sexual harassment of which they had actual knowledge; (4) that is so severe, pervasive and objectively offensive as to deprive the victim of educational opportunities or benefits provided by the school. Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 650 (1999). For peer to peer harassment, municipal defendants are liable for the knowing misconduct of those of its officials in position to take corrective action, who, by their deliberate indifference to the peer sexual harassment, knowingly violate Title IX's prohibition of sex discrimination. Porto v. Town of Tewksbury, 488 F.3d 67, 72-73 (1st Cir. 2007) (sexual activity between students considered sexual harassment based on gender under Title IX).

A funding recipient is deliberately indifferent to student-on-student harassment when "the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis at 648. "[T]he deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." Id. at 645. "[A] claim that the school system could or should have done more is insufficient to establish deliberate indifference." Porto v. Town of Tewksbury, 488 F.3d at 73. However, inaction or failure to take additional measures after initial efforts fail, however, gives rise to deliberate indifference. Id. at 74. When it learns that measures it has taken have proven inadequate, the

funding recipient must take "further steps" to avoid liability. Wills v. Brown University, 184 F.3d 20, 26 (1st Cir. 1999). A defendant's inaction "could be construed as action, in that it effectively encouraged the harassment to continue." J.R., 2015 WL 5007918 at *5. Where school officials ignore past sexual harassment and its effect on their students, they are deliberately indifferent under Title IX. See H.B. v. State Bd. of Educ., No. 4:14-CV-204-BO, 2015 U.S. Dist. LEXIS 61289, at *15. (E.D.N.C. May 8, 2015) (denying a school's motion to dismiss a Title IX claim where the school dismissed the student's allegations of rape and did not provide medical treatment); Santiago v. Puerto Rico, 655 F.3d 61, 73-74 (1st Cir. 2011) (school principal who has the ability to take corrective measures and who receives actual notice of alleged sexual harassment but refuses to take corrective action can render the school district liable under Title IX for creating a hostile educational environment.).

"In evaluating Title IX cases, whether "gender-oriented conduct is harassment depends on a constellation of surrounding circumstances, expectations and relationships including but not limited to the harasser's and victims ages and the number of persons involved. Davis, 536 U.S. at 651. When evaluating a hostile educational environment, the Court must apply a less rigorous threshold of offensive conduct when the plaintiffs claim that sexual harassment has created such an environment than when plaintiffs seek a similar claim to support a hostile workplace sexual harassment claim. Guckenberger v. Boston University, 957 F.Supp. 306, 316 (1st Cir. 1997). "[T]o state a hostile environment claim for discrimination by unlawful harassment, a plaintiff must show that the alleged harassment creates an objectively hostile or abusive ... environment and that the putative victim subjectively perceives the environment to be abusive." Id. at 314 (citations omitted). Harassment based on sexual stereotyping supports a Title IX claim. Lipsett v. University of Puerto Rico, 864 F.2d 881, 905-906, 909 (1st Cir. 1988). See Snelling v. Fall

Mountain Regional School District, 2001 WL 276975 (D.N.H. 2001) (harassment based on perpetrators' sex based stereotypes of masculinity, actionable under Title IX).

In the present case, fueled by the "sports culture" as well as the affirmative actions of Teachers Siragusa, Kender and Cole, AD Moreau, allowing the assailants to attend school without restriction; played sports on the same team with their victim; the Defendants discrediting of Matt "sent a message" to his tormenters that they could harass him, thereby effectively "'condon[ing],' acquiesce[ing] to,' and even 'encourag[ing]' that unconstitutional behavior."[8] Lipsett, 864 F.2 at 907. The Defendants' affirmative acts and inactions caused Matt to undergo harassment or made him liable or vulnerable to it. See Davis, 526 U.S. at 645. Every comment and act taken against Matt was because he was a rape victim who had been sexually assaulted with a broomstick and reported the crime for prosecution. Every statement of broomstick, rape, dildo and 'up or in the ass' comment directly refers to that criminal sexual act. All of the acts were part of an organized pattern of conduct taken against Matt; they were not isolated events. The sexual harassment also related to the criminal prosecution and started after the police got involved, increased when the criminal investigation would heat up, and finally went into overdrive after April 16, 2014. The harassment was severe, pervasive, objectively offensive and caused Matt to be deprived of educational benefits where he had to transfer out of CHS.

The Defendants viewed Matt's rape as a "juvenile act" where "boys were being boys" where CPS was making men tough enough to play Chelmsford sports. If a female was forcibly restrained, dragged from her bed into a shower and held against her will while students took turns trying to insert a broomstick into her anus; CPS would not call this a juvenile "boys being boys" act and let the students return to school without restriction, interacting with the victim and

_____

[8] For additional affirmative acts, please see Plaintiffs Opposition to the Individual Defendants, pp.11-12.

letting two assailants play on the same lacrosse team where the victim is bullied, harassed and assaulted in front of the coaches and where she is repeatedly called "Broomstick" and where her assailants repeatedly bully and harass the victim during the school year. The Defendants would not have treated a female rape victim in the same manner if she reported the crime to law enforcement for prosecution.

It is question of fact for a trier of fact, to determine if the inference should be drawn where repeated and pervasive "sexual or gender-specific comments, epithets, and/or conduct that 'so poisoned the entire body of conduct towards Plaintiff' that a jury could reasonably view other facially neutral conduct directed at the plaintiff as sexual or gender-based as well." Hankey v. Town of Concord-Carlisle, No.13-11870-IT (D. Mass. September 30, 2015) (citations omitted). For these reasons, the Plaintiffs have plead plausible Title IX claims and alleged facts that demonstrate the Defendants had actual knowledge of the harassment, had the ability to take corrective measures, but was deliberately indifferent where its "response", if any, was clearly unreasonable was clearly unreasonable in light of known circumstance. Porto, 488 F.3d at 72-73.

### D. The Plaintiffs Properly Plead Their IDEA Claims as They Allege Futility and Lack of Knowledge Where the Defendants Were Deliberately Indifferent (Count III).

Under the Individuals with Disabilities Education Act ("IDEA"), Matt was entitled to a "free appropriate public education" ("FAPE") where he had an individualized education plan ("IEP". A plaintiff does not have to exhaust available administrative remedies if the plaintiff can show the administrative remedies afforded by the process are inadequate given the relief sought." Frazier, 276 F.3d at 59; see also, Hong v. Doe, 484 U.S. 305, 327 (1988) (under predecessor statute "parents may bypass the administrative process where exhaustion would be futile or inadequate); 121 Cong. Rec. 37,416 (1975 remarks of Sen. Williams) ("[E]xhaustion of the administrative procedures… should not be required for any individual complaint filing a judicial

action in cases where such exhaustion would be futile either as a legal or practical matter."). Plaintiffs must prove that "pausing to exhaust the IDEA's administrative process would be futile (and, therefore, that non-exhaustion should be excused)" in order to proceed on this claim. Frazier, 276 F.3d at 64. Also, "exhaustion of administration remedies is not required where 'the school has denied the plaintiff access to the administrative remedies." Christopher W. v. Portsmouth School Committee, 877 F.2 1089, 1096 (1st Cir. 1989).

In the present case, the Defendants did not exhaust any administrative remedies as it would have been a futile matter where the Defendants didn't tell them they had IDEA rights. Matt was under an IEP that the Defendants did not follow during the 2013/2014 school year and CPS did not re-address it in light of Matt's sexual assault or bullying and harassment he endured during that school year. The Thomas family was more concerned with Matt's safety from the bullying, harassment and retaliation. The Defendants were deliberately indifferent towards in all regards, constitutional rights and his IDEA rights. When issues with Teacher Kender were brought to Dean Doherty's attention, instead of requiring her to follow the IEP, he thought a peer tutor was appropriate. Due to rapid deterioration of the already hostile educational environment between the May 27th "in the ass" graffiti and Teacher Kender's June 4th wrongful failure of Matt with a pending NH finality date, the Plaintiffs determined that CHS was not safe for Matt; it would likely get worse and CPS was fairly addressing Matt's educational needs. The family unilaterally and swiftly moved Matt to a private school as the application deadline was looming where the Town gave its implicit consent by providing all of the necessary transfer paperwork.

**E.     The Plaintiffs Have Properly Named CSC as a Municipal Defendant (Count X and Count XII).[9]**

---

[9] Counsel apologies for mislabeling two counts, however, he found the Defendants relabeling confusing. Counsel is using the original counts as set forth in the Complaint but noting when a count number is duplicative.

At this junction, the Plaintiffs have sufficient plead facts for claims of relief against both the Town and CSC under the Massachusetts Tort Claim Act ("MTCA"). The Town is the employer of the individual named Defendants and other CPS employees not sued in their individual capacity. The CSC is the legislative body that is the official policymaker for CPS and hires and supervises the Superintendent of Schools position and is responsible ensuring that CPS is run in accordance with all applicable laws, regulations, policies, practices and contractual agreements. As such, CSC could be the responsible party for the negligence claims. Due to this lack of clarity, both entities were served with presentment letters. ¶210.[10] The Plaintiffs have sufficiently plead facts to set forth plausible claims against CSC as well as the Town regarding the MTCA claims.

**F.** **The Plaintiffs Have Sufficiently Plead Claims for Claims Against the Municipal Defendants Under M.G.L.c.258 (Count Ten).**

"Because of the relationship between a school and its student, a [municipality] has a duty of care to a student to provide her with reasonably safe school premises." Alter v. Newton, 35 Mass. App. Ct. 142, 145 (1993); Whitney v. Worcester, 373 Mass. 298, 223 (1977). The duty of care owed to students by school officials is the reasonable care of reasonably prudent persons under the circumstances. Alter v. Newton, 35 Mass. App. Ct. at 145; Wightman v. Methuen, 26 Mass. App. Ct. 279, 280 (1993). With respect to the events at Camp Robindel and the 2013-2014 school year, CPS repeatedly breached its duty of care to Mattie for which he suffered injuries caused by that breach of care.

---

[10] Until discovery is completed and the Plaintiffs know exactly the relationships between the Town, CSC and the individually named Defendants, they are reluctant to agree to any dismissal. To be blunt, the fear is the Defendants would employ their 'gotcha' strategy where if CSC is dismissed, the Town will later argue that the CSC was the proper party for either the MTCA negligence claims or the §1983 claim, Title IX and IDEA claims as CSC is the official policymaker for CPS and responsible for hiring and supervising Superintendent Tiano. The Plaintiffs note the Defendants are only asking that the MTCA against CSC be dismissed and not any other cause of action. If CSC and the Town were truly one and the same, the Defendants would have moved to dismiss one on all counts.

1.    The Plaintiffs Have Properly Plead a Claim of Negligence Involving Third Persons Where The Municipal Defendants Were the Original Cause.

The Plaintiffs have alleged the following negligence claims against the municipal defendants: 1) Camp Robindel and 2) the 2013/2014 school year. See Complaint, Exhibit A, pp.39-40. Matt has all claims listed in Exhibit A for both dates; his parents have negligent infliction of emotional distress claims for both Camp Robindel and the 2013/2014 school year.

Based on the allegations, Section 10(j) does not protect the Defendants to so much of the negligence claims that are based on third party actions as the municipal defendants were the "original cause" of the harms against the Plaintiffs. The SJC has "construed the 'original cause' language to mean an affirmative act (not a failure to act) by a public employer that creates the 'condition or situation' that results in harm inflicted by a third party." Kent v. Commonwealth, 437 Mass. 312, 318 (2002). Such conduct is considered an act "originally caused by the public employer." Id at 319. The correct inquiry is whether the public employer's act "materially contributed to creating the specific 'condition or situation' that resulted in the harm." Id. In Gennari v. Reading Public Schools, 77 Mass. App. Ct. 762, the principal's decision to hold recess on a concrete yard constituted an "original cause" of the situation that lead to an injury of a child where "[r]unning, falling, and pushing are understood, foreseeable, even inherent parts of first-grade recess" regardless of if another student pushed or fell into the plaintiff. Id. at 765.

The Defendant claims that each individual defendant acted individually and independently regarding bullying and harassment is disingenuous and inconsistent with the Plaintiffs' pleadings and reasonable inferences. The Plaintiffs' rely on the arguments and facts regarding the "affirmative acts" taken by the individual Defendants as set forth in III.C., pp.11-12 of their Opposition memorandum to the Individually Named Defendants. In a nutshell, the "sports culture" policy, practice and custom and/or the various affirmative actions of the

individually named defendants "originally caused" the many third-party torts against Matt. The perpetrators of these acts included his assailants, their friends and CPS personnel. In short, CHS students saw their CPS, their coaches and teachers treated the assailants versus how they picked on Matt and looked the other way while Matt was being harassed like the lacrosse coaches. This galvanized and emboldened certain CHS students, mostly lacrosse players, wrestlers and football players to bully and harass Matt without fear or discipline as the Defendants condoned such acts.

Additionally, Section 10(j)(i) also provide basis for liability. If a municipal defendant "explicitly and specifically assures safety or assistance....[where] injury results in reliance on those assurances  resulted in part from reliance on those assurances" a plaintiff may recover. M.G.L.c.258, §10(j)(i). Under 10(j)(1) "by 'explicit' the Legislature meant a spoken or written assurance, not one implied from the conduct of the parties or the situation, and by 'specific' the terms of assurance must be defined, fixed, and free of ambiguity." Lawrence v. Cambridge, 422 Mass. 406, 410 (1996). The statute provides that the exception applies only where "the injury resulted in part from reliance on those assurances." G.L.c.258, §10(j)(1). In the present case, for the 2013/2014, Superintendent Tiano and Dean Doherty and others repeatedly made specific assurances that Matt would safe and had they followed CPS's BIP, MOU and state law on bullying, Matt would not have been repeatedly harassed during the school year from peers and teachers. The Thomas relied on those assurances and as a result Matt suffered injury removed from CHS.

> 2. Based on the Allegations Plead the Discretionary Function Immunity 10(b) is Inapplicable.

The Plaintiffs do not allege the Defendants failed in retaining enough supervisors at Camp Robindel; they allege there was no supervision when the students were in the bunkhouses.

As noted earlier. a municipality is bound to consider that young school children are "predictably irresponsible." Tyron v. City of Lowell, 29 Mass. App. Ct. at 722 (1991) (citations omitted) (degree of care municipality owed a twelve year old student injured on railroad tracks was question of fact). In short, they owed a duty of care to Matt to ensure an adult was supervising them while they were in the bunkhouses. No one was present. Instead, the adults were offsite, jet-skiing and/or drinking beer. Like so many instances, the Defendants misstate and misrepresent what the Complaint states. The Defendants claim Mrs. Thomas told Coach Rich "it was his fault *"for not adequately supervising the players."* (IND Memo, page 9) (emphasis added by Defendants) when the complaint reads: "as he knew about past incidents and there was no adult supervision." ¶58.

## G.    Mr. and Mrs. Thomas Have Plead Sufficient Facts to Satisfy the Proximity Requirement for Their Claim for Negligent Infliction of Emotional Distress.

A parent making a claim of negligence infliction of emotional distress stemming from injuries to her child must witness the injury or come upon the injured person promptly thereafter. Nancy P. v. D'Amato, 401 Mass. 516, 520 (1988). "A plaintiff who rushes onto the accident scene and finds a loved one injured has no greater entitlement to compensation for that shock than a plaintiff who rushes instead to the hospital. So long as the shock follows closely on the heels of the accident, the two types of injury are equally foreseeable." Ferriter v. Daniel O'Connell's Sons, 381 Mass. 507, 518 (1980). In Ferriter, the husband's wife and children were allowed to pursue the claim though "neither witnessed the accident nor came on the scene of the accident when Michael was there." Id. at 509. Defendants rely on cases where the emotional distress came after the injured party was deceased. See Miles v. Edward O. Tabor, 387 Mass. 783, 788 (1982) ("there is no evidence that Miles suffered any symptoms of emotional distress until after Damon died"). In the present case, Mr. and Mrs. Thomas have alleged claims

36

regarding both Camp Robindel and the 2013/2014 school year including the 2014 July release of Matt's records. While neither was with Matt while he survived the rape and its aftermath, (had they or a responsible adult been present; we wouldn't be here), the shock they received "closely on the heels" of all the horrible acts inflicted on Matt. Regarding Camp Robindel, Mr. Thomas was made aware of some of the assaultive behavior on Friday, August 23rd and was in route there until Coach Rich called him off; and, both Mr. and Mrs. Thomas learned of the horrible rape within a day of it occurring. For the 2013/2014 school year, Mr. and Mrs. Thomas learned of each incident either in 'live time' via telephone or at the end of each school day. Regarding the July 2014 unauthorized release of Matt's records, Mr. Thomas was the one who learned of this from the school.

**H.      The Plaintiffs Have Plead A Viable Loss of Consortium Claim.**

In pertinent part, M.G.L.c.258, "***Public employers shall be liable for injury*** or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, ***in the same manner and to the same extent as a private individual under like circumstances…***" M.G.L.c.258, §2. (emphasis added). M.G.L.c.231, §85X is a derivate claim that where "a consortium claim may be brought only when the claimant's spouse has a valid tort claim." Tauriac v. Polaroid Corporation, 716 F.Supp. 672, 673 (D. Mass. 1989). Sheehy v. Town of Plymouth, 948 F.Supp. 119 (D. Mass., 1996) (defendants only challenged loss of consortium claim based on underlying tort). Koran v. Weaver, 482 F.Supp.2d 165 (D. Mass., 2007) (parents' loss of consortium denied as they failed to include them in a presentment letter).

But for G.L.c.258, the municipal defendants are immunity to negligence claims. G.L.c.258 is the horse and G.L.c.231, is the cart; Defendants' argument puts the cart ahead of the

horse. M.G.L.c.4, §7 does not include definitions for "public employer" or "private individual" and states if a "contrary intention clearly appears" any listed definition does not necessarily mean what is defined. Id. Further, M.G.L.4, §6, on statutory construction, "words and phrases shall be construed according to the common and approved usage of the language…" Presumably, the reason there is no Massachusetts appellate authority is because M.G.L.c.258 is clear and unambiguous: a "public employer" is a "private individual", i.e., a person, who is subject to the loss of consortium statute. The cases cited by the Defendants do not discuss statutory construction. However, a 2012 Superior Court decision addressed it. In <u>Cavanaugh, et al. v. Tantasqua Regional School District</u> (Lawyers Weekly No. 12-017-12) (4 pages) (Tucker, J.) (Worcester Superior Court) (Docket No. 2011-01797A) (Feb. 14, 2012), the court wrote:

> The Massachusetts Tort Claims Act provides generally that towns may be held liable for negligent or wrongful acts or omissions of their public employees 'in the same manner and to the same extent as a private individual under like circumstances.' … In enacting this comprehensive statutory 'scheme of governmental liability that is consistent with accepted tort principles and the reasonable expectations of the citizenry with respect to its government,' … the statute did not create new actions of tort liability….The Legislature is presumed to have known the provisions of G.L.c.258,§2, enacted in 1978, and the decisions interpreting these provisions when it passed G.L.c.231,§85X in 1989. Specifically, it was aware that since the abrogation of sovereign immunity with the passage of c.258, municipalities would be liable in tort 'to the same extent as a private individual.' G.L.c.258,§2. Moreover, the Legislature did not attempt to expressly exempt municipalities from c.231,§85X's provisions….The defendant School District may be sued in tort for loss of a child's consortium under G.L.c. 258.

See also, <u>Ringuette v. City of Fall River</u>, 888 F.Supp. 258 (D. Mass., 1995) (loss of consortium claim against municipality survived motion for summary judgment); <u>Bain v. City of Springfield</u>, 424 Mass. 758 (1997) (municipalities are "persons" under G.L.c.151B,§9 liable for punitive damages and SJC rejected argument that §9 had to specifically state it applied to municipalities). Because commonsense dictates a "person" is a "private individual", the Plaintiffs have plead a sufficient cause of action regarding their loss of consortium claims.

## IV. CONCLUSION

The issue when considering a motion to dismiss "'is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible.'" Evergreen Partnering Group, Inc., 720 F.3d at 45 (quoting Anderson News, L.L.C., 680 F.3d at 189). Matt, Mr. and Mrs. Thomas have made sufficient factual allegations in their First Amended Complaint for their claims to survive Defendants' Motion to Dismiss.

### REQUEST FOR ORAL ARGUMENT

Plaintiff respectfully requests oral argument.

March 1, 2017

**MATTHEW THOMAS, JR.**
**KRISTINE THOMAS**
**MATTHEW THOMAS, SR.**
**PLAINTIFFS**

_____
Brian W. Leahey, Esq.
BBO #567403
Law Office of Brian W. Leahey, P.C.
1 Bridgeview Circle, Suite 15
Tyngsborough, MA 01879
Tel: 978.459.0396
Fax: 978.458.2307
bleahey@leaheypc.com

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was filed through the Electronic Case Filing System for filing and that copies of this electronic service will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on March 1, 2017.

/s/ Brian W. Leahey_____
Brian W. Leahey. Esq.