## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

)
MATTHEW A. THOMAS, JR., KRISTINE )
THOMAS, and MATTHEW A. THOMAS, )
)
              Plaintiffs, )
)
v. )
)
TOWN OF CHELMSFORD, CHELMSFORD )        Civil Action
SCHOOL COMMITTEE, FRANK TIANO, )        No. 16-11689-PBS
SCOTT MOREAU, BRUCE RICH, CHARLES )
CALIRI, JEFFERY DOHERTY, ANTHONY )
SIRAGUSA, MICHELLE KENDER, )
BENJAMIN COLE, and MICHAEL MOEs )
1-4, )
)
              Defendants. )
_____)

### MEMORANDUM AND ORDER

July 25, 2017

Saris, C.J.

This suit alleges that the Chelmsford public school system and its employees failed to take sufficient steps to protect a student from a sexual assault at a school-sponsored varsity football camp and from subsequent bullying and harassment by teachers and other students at Chelmsford High School ("CHS"). The individual defendants and the municipal defendants move separately to dismiss.

The Court **ALLOWS** in part and **DENIES** in part the motions to dismiss (Docket Nos. 28, 30).

1

## BACKGROUND

### I.   Parties

The plaintiffs are Matthew A. Thomas, Jr. ("Matthew"), his father ("Mr. Thomas"), and his mother ("Mrs. Thomas").

The municipal defendants are the Town of Chelmsford ("Town") and the Chelmsford School Committee ("CSC"). The individual defendants are Frank Tiano, the former Superintendent of Chelmsford Public Schools ("CPS"); Charles Caliri, the former Principal of CHS; Jeffery Doherty, the former Dean of CHS; Scott Moreau, the athletic director ("A.D.") of CHS; Bruce Rich, the former head coach of the football team at CHS; and Anthony Siragusa, Michelle Kender, and Benjamin Cole, teachers at CHS.

### II.   Factual Allegations

With all reasonable inferences are drawn in the plaintiffs' favor, the complaint alleges the following facts, many of which are disputed.

#### A.   The Sports Culture

For years, CHS embraced a sports culture that put winning ahead of everything else and encouraged bullying and harassment of student-athletes to make them "tough enough" to win championships. First Amended Complaint ("Compl.") ¶ 17. The Town, the CSC, and Superintendent Tiano knew about and condoned this "winning" sports culture, in which ordinary rules did not apply to star athletes. Id.

In September 2012, Matthew enrolled as a freshman at CHS.
Id. ¶ 30. Matthew was a special-needs student with an
Individualized Education Plan ("IEP") under the federal
Individuals with Disabilities Education Act ("IDEA"). Id. In
October 2012, during freshman football, three students -- K.M.,
G.C., and E.S. -- forced another student to urinate in Matthew's
cleats. Id. ¶ 32. The Thomas family reported the incident to
A.D. Moreau, and the three students were suspended for one game.
Id. ¶ 34.

**B.  The Rape at Football Camp**

From August 21 to 24, 2013, CHS held its annual football
camp at Camp Robindel in Moultonborough, New Hampshire. Id.
¶ 39. The students stayed in bunkhouses with no regular adult
supervision, despite CHS having knowledge of hazing and bullying
that took place at past football camps. Id. ¶¶ 19, 20, 24, 40.
In the bunkhouse, Matthew was hit in the face with powder, and
the video recording was posted to social media. Id. ¶ 42.
Matthew had his food, iPod, and cellphone stolen. Id. ¶¶ 42, 44.
Matthew was pelted with milk and repeatedly picked up by his
underwear while others laughed. Id. ¶ 42.

Matthew reported the stolen iPod to Coach Rich, who took no
action. Id. ¶ 43. Matthew reported the stolen cellphone to a
coach, who came into the bunkroom and demanded, "Who took the

phone?" Id. ¶ 44. K.M. returned the cellphone and was not
disciplined. Id.

On August 23, 2013, Matthew was on his bunk when Z.D. came
over to him, held him down, and started twisting his nipples.
Id. ¶ 46. K.M. joined in and lifted Matthew's feet so that he
could not move. Id. G.C. grabbed Matthew by his arms and legs,
and they dragged him into the shower area. Id. G.C. and Z.D.
held Matthew down while K.M. tried to insert the end of a
broomstick into Matthew's anus. Id. Matthew screamed and
resisted, but nobody came to his assistance. Id. Then, K.M. and
Z.D. held down Matthew while G.C. inserted the end of the
broomstick into Matthew's anus. Id. ¶ 47. No adult was nearby
during this approximately twenty-minute episode. Id. ¶ 49.

Later that day, another student threw Matthew's cellphone
to K.M., who rubbed the cellphone on his testicles and threw it
back to Matthew. Id. ¶ 50. K.M. then came over to Matthew,
placed his knee on Matthew's chest, exposed his genitalia, and
rubbed his testicles on Matthew's chin. Id.

That evening, Matthew told his parents about some of his
problems at camp. Id. ¶ 51. Mr. Thomas started driving out to
Camp Robindel, but Coach Rich called him and told him that he
wanted the opportunity to handle the issues himself. Id. Mr.
Thomas agreed. Id. When Coach Rich raised the issue with the
students, K.M. yelled at Matthew and called him a "liar." Id.

4

¶ 52. Coach Rich told K.M. to just apologize, which K.M. did. Id.

On August 24, 2013, Coach Rich told Mr. Thomas that the issues were taken care of. Id. ¶ 53. Coach Rich also told Mr. Thomas that K.M. was one of his "special players" who needed to remain on the team because sports helped keep him out of trouble. Id.

That night, Matthew told his parents about the broomstick incident. Id. ¶ 55. On August 25, 2013, Mrs. Thomas emailed Coach Rich to demand that he investigate. Id. ¶ 57. In the email, Mrs. Thomas told Coach Rich that if the issue was not adequately resolved by noon the next day, she would report to the police, the CSC, and Superintendent Tiano. Id. Later that night, Mrs. Thomas spoke with Coach Rich, who apologized. Id. ¶ 58.

On the morning of August 26, 2013, Mrs. Thomas forwarded her previous day's email to A.D. Moreau and stated that she would report to the police, the CSC, and Superintendent Tiano if she did not hear from him or Coach Rich by noon. Id. ¶ 59. That morning, A.D. Moreau called Mrs. Thomas and stated that CHS would look into the incident but that he did not want it reported to the police. Id. ¶ 60. His words were: "Don't go to the police. You need to give us more time." Id. The Thomas family agreed. Id.

That afternoon, while the Thomas family was waiting for a meeting with A.D. Moreau, Coach Rich came by and told Matthew, "You will get through this. We will get through this. This is part of growing up." Id. ¶ 61. The Thomas family then met with CHS Deans Jeffery Doherty, Joshua Blagg, and Heather Galante. Id. ¶ 63. The Thomas family explained to the Deans what had happened to Matthew. Id. The Deans instructed the Thomas family not to speak to anyone about the matter. Id. The Deans did not explain how they would handle the situation other than to say the perpetrators would not be in any of Matthew's classes. Id. CHS did not report the incident to the police. Id. ¶ 64.

On August 27, 2013, the Thomas family reported the Camp Robindel incident to the police. Id. ¶ 66. The Middlesex District Attorney's Office contacted the Moultonborough Police Department and started an investigation. Id. ¶ 67.

On August 28, 2013, CPS took written statements from two of the students involved in the Camp Robindel incident. Id. ¶ 68. One of them wrote that Matthew was lying about everything. Id. The other admitted that he hit Matthew with a broomstick around "his butt/back of thigh" but he "didn't see that it had left a mark." Id. He wrote, "I am not proud of what I did, but I am also not sorry for what I did to Matt. Thinking back on it I was teaching him a lesson." Id.

6

On August 30, 2013, Deans Doherty, Blagg, and Galante produced a "Summary Report" on the school's internal investigation into the Camp Robindel incident. Id. ¶ 74. This report allegedly "whitewashed" the incident by failing to describe the details of the broomstick incident, how Matthew came to be lying prone on the floor of the bathroom, and why there was no adult supervision. Id. ¶ 75.

### C.   Post-Incident Bullying and Harassment

Around this time, other CHS students began to hear about the camp incident. Id. ¶ 71. Students began to make comments about how Matthew was lying and started to call him "Broomstick," in reference to the assault. Id. ¶¶ 71, 73. Comments on the Camp Robindel incident also began to appear on social media. E.g., id. ¶ 77 ("What's up with high school boys sticking stuff up each other's asses these days?")

On September 3, 2013, Mrs. Thomas contacted Principal Caliri to ask how Matthew would be protected at school. Id. ¶ 79. Principal Caliri did not provide any answers. Id.

On September 4, 2013, Matthew went to school and learned that K.M. was registered in two of his classes. Id. ¶ 80. Although K.M. was not in school, Matthew was present in both classes as K.M.'s name was called. Id. The Thomas family demanded that K.M. be transferred. Id.

Various students at school continued to make derogatory
sexual comments to Matthew about the Camp Robindel incident, and
social media postings about the incident continued. E.g., Id.
¶¶ 81 ("Hey Broomstick! How is your asshole? Did it hurt?"), 83
("You are so annoying you got a pole shoved up your ass at
football camp."), 88 ("Matt Thomas went to camp a tight end and
came back a wide receiver."), 108 ("Hey look, is that the kid
that got fucked by the broomstick?"), 120 (students said that
they heard that Matthew was raped with a "big black dildo" and
asked Matthew if he "liked it and if he wanted it again"). Much
of the bullying came from lacrosse players, wrestlers, and
football players. Id. ¶ 131. Students also made threats of
violence against Matthew. Id. ¶¶ 151, 159. The Thomas family
reported these incidents to Dean Doherty throughout the school
year but each time, Dean Doherty took no action and did not
follow up with the family. Id. ¶¶ 81, 82, 83, 104, 108, 120,
152, 160. On one occasion, Dean Doherty told Matthew that
Matthew should report incidents to him, not to his mother. Id.
¶ 81.

The first media report on the Camp Robindel incident
appeared on September 9, 2013. Id. ¶ 85. An unidentified source
told the newspaper that the allegations were of "a very juvenile
nature" although some aspects were "sexual in nature." Id. Later
that day, Superintendent Tiano emailed the members of the CSC to

inform them of the media coverage and to say that CPS did a "tremendous job" in its internal investigation. Id. ¶ 86. He also promised to keep the CSC updated on the criminal investigation. Id. Superintendent Tiano also issued a press release that stated that CPD "will continue to take seriously the safety of each and every student under our care." Id.

On the morning of September 10, 2013, media outlets appeared at CHS. Id. ¶ 89. Nobody from CPS informed the Thomas family about the media's presence, and Matthew arrived at school wearing a CHS football shirt. Id. Principal Caliri announced that the media would not approach any student on school grounds and that no student had to speak with the media. Id. ¶ 91. Nobody from CHS spoke to Matthew about the media or offered to help him avoid the media. Id. That afternoon, a reporter approached Matthew as he exited CHS alone. Id. ¶ 92. Matthew declined to discuss the Camp Robindel incident and walked away, but the reporter followed him and continued to ask him questions. Id. The Thomas family reported the incident to Dean Doherty and asked how the media was at the CHS entrance. Id. ¶ 93. Dean Doherty responded, "They were not supposed to be. I guess no one was watching." Id.

That evening, the CSC had its first meeting since the media broke the story about the Camp Robindel incident. Id. ¶ 94. A prepared press release was read, and the CSC made no further

comments. Id. This was the only time the CSC addressed the allegations during the 2013 to 2014 school year, despite individual members of the CSC being informed at various points in the year about the difficulties that Matthew was having at school. Id. ¶ 94, 133.

On September 11, 2013, Matthew was interviewed by the Middlesex District Attorney's Office. Id. ¶ 96. Police investigators had trouble interviewing CPS personnel, however, because they were uncooperative with the investigation. Id. ¶ 97. For example, the Moltonborough Police Department tried to set up an interview date but was told that CPS personnel would be at an away football game. Id. In fact, those particular CPS personnel were not at the game. Id.

### D. Alleged Misconduct by Teachers and Administrators

On September 12, 2013, Mrs. Thomas met with Dean Doherty. Id. ¶ 98. K.M., G.C., and Z.D. had been suspended for ten days and were soon expected to return to school, and the Thomas family was worried about Matthew's safety. Id. Dean Doherty assured Mrs. Thomas that CHS would ensure Matthew's safety. Id. The Thomas family also met with Superintendent Tiano to discuss how Matthew would be protected. Id. ¶ 100. Superintendent Tiano told Mr. Thomas: "We have teachers in the hallway that monitor things and he will be fine." Id. The Thomas family asked that K.M., G.C., and Z.D. be assigned to the CHS annex, a separate

learning area away from the general student body where problematic students are assigned. Id. ¶ 101. That request was not granted. Id. In a September 13, 2013 follow-up email, Dean Doherty told Mrs. Thomas that Matthew could leave class at any time to speak with him and that "I will be in the hallways discreetly checking on him, so if something is not going well he can give a slight shake of his head to signal me." Id. ¶ 102.

Also on September 13, 2013, Spanish teacher Siragusa singled out Matthew in front of the whole class and told Matthew to keep quiet and to stop moving, even though he was causing no disruption. Id. ¶ 103. Matthew became upset and left class. Id. After Matthew returned to class, Siragusa had his class translate from English to Spanish: "Matt went to football camp. Matt called his parents. Why did Matt call home?" Id. The Thomas family reported the Siragusa comments to Dean Doherty. Id. ¶ 105. Dean Doherty apologized for Siragusa's actions, stating that Siragusa "feels badly for what had happened." Id. Matthew was removed from Siragusa's class and ended up having to repeat Spanish the following school year. Id. ¶ 106.

On September 16, 2013, K.M., Z.D., and G.C. returned to school from their suspensions. Id. ¶ 107. They were suspended from the football team for the season. Id. There was no safety plan for Matthew, and neither Dean Doherty nor any monitors were

keeping watch in the hallways, as Superintendent Tiano and Dean Doherty had promised. Id.

On September 20, 2013, Superintendent Tiano informed the CSC that he would not make any further communication to parents about the Camp Robindel incident "in the absence of any new information" to avoid generating "another news cycle." Id. ¶ 109. Superintendent Tiano did not inform the CSC of the bullying and harassment of Matthew. Id.

On September 30, 2013, Matthew was yelled at by his science teacher, Kender. Id. ¶ 111. After two other students got into an argument, Kender took Matthew into the hallway and screamed that he was an "instigator" who was causing all sorts of "trouble" and that she "was sick of it." Id. When Matthew tried to speak, Kender told him to "be quiet." Id. The Thomas family reported the incident to Dean Doherty, who said he would look into it. Id. ¶ 111. Dean Doherty later told Mrs. Thomas that he had spoken to Kender and hoped that there would be no further issues. Id. ¶ 112.

In early October 2013, Moreau swore at Matthew after he tossed a packet of snacks to a friend. Id. ¶ 113. Moreau yelled, "No Matt, get the hell out of the hallway and go back to your fucking locker room!" Id. The incident was reported to CPS. Id.

On November 5, 2013, Mrs. Thomas informed Dean Doherty of new problems that Matthew was having with Kender, who was

questioning his study habits and failing to comply with Matthew's IEP. Id. ¶¶ 122–24. Dean Doherty informed Mrs. Thomas that Matthew would get a peer tutor. Id. ¶ 125.

On November 18, 2013, Kender watched a student hit Matthew with a shoe in her class. Id. ¶ 126. Kender walked away, appeared happy, and did not discipline the student. Id. The Thomas family reported the incident to Dean Doherty, who took no action. Id.

In November and December 2013, Z.D. made constant vulgar comments toward two of Matthew's friends. Id. ¶ 127. The students reported the incidents to Dean Doherty, who took no action. Id. ¶¶ 128, 129.

Through the end of 2013 and early 2014, CHS teachers were falsely told that the criminal case was over and that Matthew had made everything up. Id. ¶ 132. The complaint does not state who allegedly made these statements.

In early March 2014, Mr. Thomas contacted A.D. Moreau to discuss how CHS was going to keep Matthew safe during the upcoming lacrosse season, as Matthew, K.M., and G.C. all played. Id. ¶ 134. Moreau responded that since the school had determined that there was no wrongdoing by K.M., G.C., and Z.D., there was nothing he could do but that there would be adults in the locker room. Id. ¶ 137.

During lacrosse tryouts, Matthew was mocked and ridiculed by K.M., G.C., and other players. Id. ¶ 138. K.M. was injured and was not trying out, but he was still present on the sideline. Id. The coaches were aware of K.M. and G.C.'s actions but did nothing to stop them. Id.

On March 19, 2014, Mr. Thomas emailed CPS to express his concerns about lacrosse tryouts. Id. ¶ 139. A.D. Moreau responded that coaches were supervising the players, including from the coaches' room by the locker room area. Id. ¶ 140. But the coaches' room did not have windows and the door was typically kept closed and locked, so someone inside the coaches' room would not be able to see or hear what was going on in the locker room. Id.

After this date, Matthew's coaches treated him differently and regularly expressed anger at him. Id. ¶ 141. K.M. was with the team throughout the season even though he was not playing or practicing, and he continued to taunt Matthew. Id. ¶ 142.

In April 2014, Z.D. continued making sexually explicit and threatening comments to two of Matthew's friends. Id. ¶ 144. When Dean Doherty received reports about those incidents, Dean Doherty told one of the students to "man up and try to go to lacrosse practice" and that the incident was just "boys just being boys." Id. ¶ 145.

14

Harassment of Matthew increased in frequency and severity in late April 2014. Id. ¶ 149. Matthew reported to Dean Doherty that he perceived threatening actions not only from Z.D. and his friends, but also Cole, a teacher. Id. ¶¶ 149, 151, 153–56, 158. Specifically, there was one occasion when Matthew was in the CHS library with friends, and Cole approached and started talking to Matthew's friends while staring intently at Matthew. Id. ¶ 154. On many days, Cole stood outside Matthew's history class and intently stared at Matthew and his friends as they entered history class. Id. ¶ 155. On one occasion outside of school, Cole approached a friend of Matthew who was fishing and said "It's better to have a pole in your hands than up your ass." Id. ¶ 156.

At lacrosse practice, a senior captain tried to take Matthew out each time they lined up against each other in a drill, to cheers of the team. Id. ¶ 159. On one occasion, the captain went up to Matthew, yanked his facemask, and yelled in his face that he "was going to fucking kill him" if Matthew did not quit the team. Id. These incidents were reported to the school and to the coach, who took no action. Id. ¶ 160. Soon thereafter, Matthew was suspended for two games, with the given reason being an unspecified incident that the captain supposedly reported to the coach. Id. ¶ 161.

On May 5, 2014, Kender interrupted a conversation that
Matthew was having with a classmate who had gotten into trouble.
Id. ¶ 163. Kender said, "Oh, Mattie, you throw people under the
bus." Id. Kender told Matthew that he "had bad character" and
told him that he should have talked to the person instead of
"telling on him." Id. She then gave a speech to the class
suggesting that "children who report something are snitches and
are the worst type of person." Id. Mrs. Thomas sent an email to
Dean Doherty about this incident, but Dean Doherty did not
respond. Id. ¶ 165.

On May 6, 2014, a student slapped Matthew in the head and
knocked off his hat. Id. ¶ 164. He looked straight at Matthew
and said, "Take that shit off." Id. Matthew reported this
incident to Dean Doherty, who said he would look into it. Id.

On May 27, 2014, someone wrote graffiti relating to Matthew
and the Camp Robindel incident in a CHS bathroom. Id. ¶ 168
("Matt Thomas likes it in the ass."). The incident was reported
to the CHS dean's office, which reported the incident to the
police. Id. This was the twenty-fourth incident that Matthew and
his family reported to CPS during the 2013 to 2014 school year.
Id. ¶ 169.

On June 5, 2014, Mrs. Thomas learned that Kender had given
Matthew a failing grade on a lab report when Matthew's partner
had received a perfect score for the same report. Id. ¶ 171.

Mrs. Thomas reported to Dean Doherty and Principal Caliri that Matthew was being targeted and singled out by Kender. Id.

### E.   Transfer to Another School

At the conclusion of the 2013 to 2014 school year, the Thomas family decided to transfer Matthew to Central Catholic High School because they believed that Matthew was not safe at CHS and CHS was not meeting his educational needs. Id. ¶ 172. Matthew had to repeat his sophomore year at Central Catholic. Id. ¶ 188.

In about August 2014, K.M., G.C., and Z.D. pleaded guilty in their criminal cases in juvenile court. Id. ¶ 190. K.M. and G.C. pleaded guilty to a felony and a Class A misdemeanor charge, while Z.D. pleaded guilty to two Class A misdemeanor charges. Id. Three months later, in November 2014, K.M. was honored for his sportsmanship and leadership at a Massachusetts Interscholastic Athletic Association event at Gillette Stadium in Foxboro, MA. Id. ¶¶ 202-03.

CHS students continued to harass Matthew when Central Catholic played CHS in football and lacrosse. Id. ¶¶ 200, 209, 229. At the CHS-Central Catholic sophomore football game in September 2014, Mrs. Thomas was taking photos on the sideline when A.D. Moreau told her that she could not have her younger children on the sideline and that she could not be taking

pictures there. Id. ¶ 199. However, other parents were allowed to remain doing exactly what Mrs. Thomas was doing. Id. ¶ 201.

On August 7, 2015, the Thomas family sent the Town and CSC a presentment letter, which was confidential because it referenced juvenile proceedings. Id. ¶ 210. The media reported on the presentment letter. Id. ¶ 212. In an August 21, 2015 local newspaper story, Salvatore Lupoli, a CHS assistant football coach and CSC member, stated that he hoped "that people will consider these young men innocent until proven guilty." Id. ¶ 214. Sometime soon after, the local newspaper anonymously received an unredacted copy of the presentment letter. Id. ¶ 216. Only the Thomas family, the Town, and the CSC had the letter. Id. ¶ 216. In response to a September 11, 2015 newspaper editorial, Lisa Vecchione, the sister of Moreau, published a statement (although it is unclear where): "The allegations were unfounded. Case closed." Id. ¶ 217. Around that same time, the families of K.M., G.C., and Z.D., through their spokesperson, issued a press release denying the incidents at Camp Robindel. Id. ¶ 218.

## III. **Procedural History**

The plaintiffs originally filed their complaint on August 19, 2016. The operative complaint is the first amended complaint, which was filed on August 22, 2016. The operative complaint raises fourteen causes of action:

18

Count I: 42 U.S.C. § 1983 claim for violation of substantive due process right to bodily integrity, First Amendment rights to free speech and to petition the government, the Equal Protection Clause, and "stigma plus" defamation, against the municipal defendants.

Count II: Title IX claim under 20 U.S.C. § 1681, against the municipal defendants.

Count III: Claim for IDEA reimbursement under 20 U.S.C. § 1400b, against the municipal defendants.

Count IV: 42 U.S.C. § 1983 claim for violation of substantive due process right to bodily integrity, First Amendment rights to free speech and to petition the government, the Equal Protection Clause, and "stigma plus" defamation, against the individual defendants.

Count V: 42 U.S.C. § 1983 claim for conspiracy to violate federal constitutional rights, against the individual defendants.

Count VI: Violation of the Massachusetts Declaration of Rights, against the individual defendants.

Count VII: Violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H-11I, against the individual defendants.

Count VIII (mislabeled as Count VII): Conspiracy to violate the Massachusetts Civil Rights Act, against the individual defendants.

Count IX (mislabeled as Count VIII): Defamation, against the individual defendants.

Count X (mislabeled as Count IX): Intentional infliction of emotional distress, against the individual defendants.

Count XI (mislabeled as Count X): Negligent infliction of emotional distress, against the municipal defendants.

Count XII (mislabeled as Count X): Civil conspiracy, by the individual defendants.

Count XIII (mislabeled as Count XI): Negligence, against the municipal defendants.

Count XIV (mislabeled as Count XII): Loss of consortium, against all defendants.

On January 10, 2017, the individual defendants and the municipal defendants filed separate motions to dismiss. The individual defendants move to dismiss all of the counts against them: Counts IV, V, VI, VII, VIII (mislabeled VII), IX (mislabeled VIII), X (mislabeled IX), XII (mislabeled X), and XIV (mislabeled XII) of the amended complaint. The municipal defendants moved to dismiss all of the counts against them: Counts I, II, III, XI (mislabeled X), XIII (mislabeled XI), and XIV (mislabeled XII) of the amended complaint.

## LEGAL STANDARD

A Rule 12(b)(6) motion is used to dismiss complaints that do not "state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6). In evaluating a Rule 12(b)(6) motion, this Court must accept the factual allegations in the plaintiffs' complaint as true, construe reasonable inferences in their favor, and "determine whether the factual allegations in the plaintiff[s'] complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71 (1st Cir. 2014).

## DISCUSSION

I. **Federal Constitutional Claims (Count I, Against Municipal Defendants, and Counts IV and V, Against Individual Defendants)**

A. **Substantive Due Process**

The plaintiffs claim a deprivation of Matthew's "substantive due process right to bodily integrity" by both the individual defendants and municipal defendants. To establish a substantive due process claim, a plaintiff must show deprivation of a protected interest in life, liberty or property that was caused by government conduct. Rivera v. Rhode Island, 402 F.3d 27, 33-34 (1st Cir. 2005). The plaintiffs' claim is that the Camp Robindel broomstick incident was a deprivation of Matthew's protected interest in bodily integrity. See Albright v. Oliver, 510 U.S. 266, 271-72 (1994) ("The protections of substantive due

21

process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."). But Matthew's injury at Camp Robindel was inflicted by other students, who are private persons, not government actors. The claimed government involvement is indirect: a failure to adequately protect Matthew from violence by other students.

In general, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). This is because "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." Id. at 195.

DeShaney recognized a limited exception to this rule under which a state has a constitutional duty to protect an individual against private violence due to a "special relationship" between the state and that individual. DeShaney, 489 U.S. at 197–200. DeShaney described that special relationship as one in which "the State takes a person into its custody and holds him there against his will" and "by the affirmative exercise of [the state's] power so restrains an individual's liberty that it

22

renders him unable to care for himself." Id. at 199–200; see also id. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."). In other words, a state's affirmative duty to protect an individual arises out of the state's exercise of its power to place an individual under "incarceration, institutionalization, or other similar restraint of personal liberty." Id. at 200.

As a general matter, courts have declined to find a "special relationship" between a public school and its students. See Hasenfus v. LaJeunesse, 175 F.3d 68, 71–72 (1st Cir. 1999) (citing Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 655 (1995) ("[W]e do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional 'duty to protect.'")); see also Morrow v. Balaski, 719 F.3d 160, 168–69 (3d Cir. 2013) ("Although the doctrine of in loco parentis certainly cloaks public schools with some authority over school children, that control, without more, is not analogous to the state's authority over an incarcerated prisoner or an individual who has been involuntarily committed to a mental facility."); Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys, 675 F.3d 849, 857 (5th Cir. 2012) (en banc) ("[A] public school does not have

a DeShaney special relationship with its students requiring the school to ensure the students' safety from private actors."); Patel v. Kent Sch. Dist., 648 F.3d 965, 973 (9th Cir. 2011) ("Compulsory school attendance and in loco parentis status do not create 'custody' under the strict standard of DeShaney."); Dorothy J. v. Little Rock Sch. Dist., 7 F.3d 729, 732 (8th Cir. 1993) ("[S]tate-mandated school attendance does not entail so restrictive a custodial relationship as to impose upon the State the same duty to protect it owes to prison inmates, or to the involuntarily institutionalized."); Doe v. Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ., 103 F.3d 495, 510 (6th Cir. 1996) ("Although, clearly, a school system has an unmistakable duty to create and maintain a safe environment for its students as a matter of common law, its in loco parentis status or a state's compulsory attendance laws do not sufficiently 'restrain' students to raise a school's common law obligation to the rank of a constitutional duty."); J.O. v. Alton Cmty. Unit Sch. Dist. 11, 909 F.2d 267, 272 (7th Cir. 1990) ("[T]he government, acting through local school administrations, has not rendered its schoolchildren so helpless that an affirmative constitutional duty to protect arises. Whatever duty of protection does arise is best left to laws outside the Constitution.").

24

The First Circuit has stated that "[n]evertheless, we are loath to conclude now and forever that inaction by a school toward a pupil could never give rise to a due process violation." Hasenfus, 175 F.3d at 72. As such, the First Circuit has recognized the possibility that "in narrow circumstances the Supreme Court might find a due process obligation of the school or school employees to render aid to a student in peril." Id.; see also Morgan v. Town of Lexington, 823 F.3d 737, 743 (1st Cir. 2016). As possible examples of such "narrow circumstances," the First Circuit described the following scenarios: "If Jamie had suffered a heart attack in the classroom, and the teacher knew of her peril, could the teacher merely leave her there to die without summoning help? If a six-year old child fell down an elevator shaft, could the school principal ignore the matter?" Hasenfus, 175 F.3d at 72. In short, the First Circuit has suggested that a public school may have an affirmative duty to protect a student in narrow circumstances where the school has actual knowledge that the student is in clear, obvious, and present peril.

Even allowing for that narrow exception, the Camp Robindel incident does not qualify. The plaintiffs argue that the school was negligent in leaving students unsupervised when it knew that students had been bullied at previous camps, and it knew that Matthew had previously been bullied by particular students who

were also at the camp. But the Camp Robindel incident was not a
situation in which school officials knew that students were
physically violating Matthew with a broomstick and yet failed to
intervene -- a situation that might fall into the narrow
exception that the First Circuit described in Hasenfus. The
school's knowledge of the possibility that Matthew might be
subjected to more minor levels of bullying (such as urinating in
his cleats without his knowledge) falls short of what is
necessary to establish a DeShaney "special relationship"
affirmative constitutional duty on the school.

Some courts have also recognized the "state-created danger"
theory, which is a second exception to the general rule that a
state has no due process obligation to protect persons from
private violence. The state-created danger theory arises from
language in DeShaney that "suggested, but never expressly
recognized, the possibility that when the state creates the
danger to an individual, an affirmative duty to protect might
arise." Rivera, 402 F.3d at 34-35 (citing DeShaney, 489 U.S. at
201). "While [the First C]ircuit has discussed the possible
existence of the state-created danger theory, [it] ha[s] never
found it applicable to any specific set of facts." Irish v.
Maine, 849 F.3d 521, 526 (1st Cir. 2017); see also Coyne v.
Cronin, 386 F.3d 280, 287 (1st Cir. 2004) ("[T]he Due Process
Clause may be implicated where the government affirmatively acts

26

to increase the threat to an individual of third-party private harm or prevents that individual from receiving assistance."); Hasenfus, 175 F.3d at 73 ("Where a state official acts so as to create or even markedly increase a risk, due process constraints may exist, even if inaction alone would raise no constitutional concern.").

There is a colorable argument that the school created a danger by sponsoring a sleepaway football camp and putting Matthew in an unsupervised bunkhouse with known bullies for multiple nights. At the overnight environment at Camp Robindel, Matthew was exposed to a markedly greater risk of violence than if he were interacting with the same bullies in football practice on the CHS campus.

But the Court ultimately need not decide that question because "[e]ven if there exists a special relationship between the state and the individual or the state plays a role in the creation or enhancement of the danger, under a supposed state created danger theory, there is a further and onerous requirement that the plaintiff must meet in order to prove a constitutional violation: the state actions must shock the conscience of the court." Rivera, 402 F.3d at 35. "In determining whether the state has violated an individual's substantive due process rights, a federal court may elect first to address whether the governmental action at issue is

sufficiently conscience shocking." Id. at 36. Only if the answer is "yes" does the Court need to address the question of whether the school had a duty to protect Matthew from other students because of either a special relationship or a state-created danger.

"The shock-the-conscience test is an extremely demanding one, and challenges analyzed under it rarely succeed." Gonzalez-Fuentes v. Molina, 607 F.3d 864, 885 (1st Cir. 2010). Conscience-shocking behavior "means conduct that is truly outrageous, uncivilized, and intolerable." Hasenfus, 175 F.3d at 72; see also Cty. of Sacramento v. Lewis, 523 U.S. 833, 847 (1998) (describing test as "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience"). "In situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'" Rivera, 402 F.3d at 36. But see J.R. v. Gloria, 593 F.3d 73, 80 n.4 (1st Cir. 2010) ("This circuit has never found on the facts of a case that deliberately indifferent behavior was sufficiently conscience-shocking to violate a plaintiff's substantive due process rights. Rivera merely suggested that under certain circumstances, deliberately indifferent behavior could conceivably qualify.").

While the students' Lord-of-the-Flies behavior shocks the conscience, that is not the issue; the relevant inquiry is whether there was any conscience-shocking behavior by the state defendants that led to the bodily injury. The Court finds that the answer is no. Although there is a plausible argument that the defendants' failure to supervise the bunkhouse was negligent, the defendants' conduct does not rise to the level of deliberate indifference. The defendants knew that bullying took place at previous football camps at Camp Robindel, but none of the previous incidents of bullying were anywhere near as serious as the broomstick rape. Similarly, while the defendants knew of one previous occasion in which Matthew was bullied in football practice -- urination in his cleats -- that incident was much less serious. There was no reason for any of the defendants to have believed that the students, if left unsupervised, would have inflicted violence of this magnitude on Matthew. Eighth Amendment cases applying the deliberate indifference standard are instructive by analogy. See Cty. of Sacramento, 523 U.S. at 849-54 (suggesting that Eighth Amendment "deliberate indifference" decisions may, in some cases, guide substantive due process determinations of whether behavior shocks the conscience). In the Eighth Amendment context, deliberate indifference requires "subjective recklessness." Farmer v. Brennan, 511 U.S. 825, 839-40 (1994); see also Burrell v.

Hampshire Cty., 307 F.3d 1, 8 (1st Cir. 2002) (requiring
"actual, subjective appreciation of risk" for Eighth Amendment
deliberate indifference claim). There was no allegation that any
of the defendants had actual, subjective appreciation of the
risk that, left unsupervised, the bullying at Camp Robindel
would escalate to a rape by teammates. The plaintiffs fail to
state a substantive due process claim against either the
individual or municipal defendants.

   B.   **First Amendment Retaliation**

   The plaintiffs argue that the individual and municipal
defendants retaliated against them for exercising their First
Amendment free speech and petition rights. This claim, unlike
the substantive due process claim, pertains to events that took
place after the Camp Robindel incident.

   "[A]s a general matter the First Amendment prohibits
government officials from subjecting an individual to
retaliatory actions . . . for speaking out." Hartman v. Moore,
547 U.S. 250, 256 (2006); see also Perry v. Sindermann, 408 U.S.
593, 597 (1972) (noting that the government may not punish a
person or deprive him or her of a benefit on the basis of his or
her "constitutionally protected speech"). The rationale for the
First Amendment retaliation doctrine is that "constitutional
violations may arise from the deterrent, or 'chilling,' effect
of governmental efforts that fall short of a direct prohibition

against the exercise of First Amendment rights." <u>Bd. of Cty.</u>
<u>Comm'rs, Wabaunsee Cty., Kan. v. Umbehr</u>, 518 U.S. 668, 674
(1996).

"Under the First Amendment, retaliation claims proceed in
two stages. A plaintiff must first prove that (1) he or she
engaged in constitutionally protected conduct, (2) he or she was
subjected to an adverse action by the defendant, and (3) the
protected conduct was a substantial or motivating factor in the
adverse action. The defendant may then avoid a finding of
liability by showing that it would have reached the same
decision even in the absence of the protected conduct." <u>D.B. ex</u>
<u>rel. Elizabeth B. v. Esposito</u>, 675 F.3d 26, 43 (1st Cir. 2012).

There is no question that Matthew and his family engaged in
constitutionally protected conduct by reporting the Camp
Robindel incident to the school and to the police and by
reporting subsequent harassment to the school.

Whether Matthew or his family suffered adverse action by
the defendants is disputed. In that employment context, the
First Circuit has stated that an adverse action is anything that
"would deter a reasonably hardy individual from exercising his
constitutional rights." <u>See</u> <u>Barton v. Clancy</u>, 632 F.3d 9, 29
(1st Cir. 2011). "A campaign of informal harassment, for
example, would support a First Amendment retaliation claim if
the alleged harassment would have such a chilling effect. Even

31

relatively minor events can give rise to § 1983 liability, so long as the harassment is not so trivial that it would not deter an ordinary employee in the exercise of his or her First Amendment rights." Id. The First Circuit subsequently applied that standard in an educational environment case more analogous to this one, in which a disabled child and his parents claimed that they were unlawfully subjected to retaliatory adverse action by the child's public school system for championing their child's rights to a Free Appropriate Public Education ("FAPE") under the IDEA. D.B., 675 F.3d at 43.

Alleged statements and actions by Matthew's teachers were sufficiently derogatory to constitute adverse action against Matthew for speaking out. The allegations pertain to three teachers: Siragusa, Kender, and Cole. Siragusa allegedly had his Spanish class translate sentences that made fun of Matthew for reporting the Camp Robindel incident. Kender allegedly yelled at Matthew, in front of other students, for being an "instigator," and then gave him an unjustifiably low grade on an assignment. Cole allegedly gave mean stares at Matthew at various times in school and, on one occasion, approached Matthew's friend while he was fishing outside of school and said, "It's better to have a pole in your hands than up your ass." The teachers' actions are sufficiently adverse and it is plausible that they were causally linked to Matthew's First Amendment activity, thereby

32

stating a claim for First Amendment retaliation.[1] Taken together, when all reasonable inferences are drawn in the plaintiffs' favor, the plaintiffs have alleged a plausible claim of retaliatory conduct by the teachers at least at this early stage of the litigation.

The plaintiffs also allege that certain school administrators retaliated against Matthew by their deliberate indifference to the sexual harassment, bullying and threats by other students and by teachers. The complaint alleges a pattern of bullying, taunting, and sexual harassment by other students after the incident. The complaint alleges that Dean Doherty was repeatedly notified of other students' harassment of Matthew and failed to take any significant action, despite promising that he would respond. The complaint alleges the same for Superintendent Tiano, Principal Caliri, and A.D. Moreau, although the complaint alleges fewer instances in which the Thomas family reported harassment to them. The complaint plausibly alleges that the reason the school administrators did not take action in response to the widespread student harassment of Matthew was that Matthew

---

[1]   The teachers' alleged actions were taken under the color of state law, satisfying the state action requirement and the color of law requirement for a § 1983 claim. Siragusa's and Kender's alleged statements by teachers were made in their capacities as public school teachers while at school. See Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995). While it is not certain whether Cole's out-of-school "pole in your hands" statement was state action, that statement at a minimum reinforces Matthew's claim that Cole would give him mean stares in school.

reported misconduct by star athletes at Camp Robindel. Cf.
Morgan, 823 F.3d at 743 (suggesting that school officials'
inaction to protect against bullying could conceivably give rise
to due process liability). The Court concludes that a school's
failure to take action to stop bullying and sexual harassment in
response to a student's complaints of rape is sufficiently
adverse to state a retaliation claim. Accordingly, Matthew has
stated a claim for First Amendment retaliation against Siragusa,
Kender, and Cole, as well as against Superintendent Tiano,
Principal Caliri, Dean Doherty, and A.D. Moreau.[2]

        As for the other plaintiffs, the only alleged retaliatory
action against either of Matthew's parents is when A.D. Moreau
made Mrs. Thomas leave the sideline in the CHS-Central Catholic
sophomore football game with no justification. However, a
reasonably hardy parent could withstand that ejection. That
incident does not allow a claim by Mrs. Thomas against Moreau to
survive the motion to dismiss. No other retaliation claims by
Mr. or Mrs. Thomas have been adequately pleaded. No adverse
actions by Coach Rich are adequately pleaded and the First
Amendment claims against him are dismissed.

---

[2]     The Court addresses the individual defendants' qualified
immunity arguments in a later section.
        The Court also addresses in a later section the question of
municipal liability for First Amendment retaliation.

C.    **"Stigma Plus" Due Process Claim (Counts I and IV)**

The plaintiffs raise a procedural due process claim against the individual and municipal defendants based on the theory of "stigma plus" defamation. Reputational harm inflicted by a state actor does not, by itself, constitute a deprivation of a liberty or property interest that invokes due process protection. URI Student Senate v. Town Of Narragansett, 631 F.3d 1, 9 (1st Cir. 2011) (citing Paul v. Davis, 424 U.S. 693, 701–02 (1976)). "Thus, when a person alleges that she has suffered stigmatization at the hands of a government actor, she must show an adverse effect on some interest 'more tangible' than reputational harm. To use the popular catch phrase, the complaining party must satisfy a 'stigma plus' standard." Id. Courts have "discern[ed] a deprivation of a constitutionally protected liberty interest when, in addition to mere reputational injury, words spoken by a government actor adversely impact a right or status previously enjoyed under state law." Pendleton v. City of Haverhill, 156 F.3d 57, 63 (1st Cir. 1998); see also Paul, 424 U.S. at 708 (suggesting that person can claim procedural protections when reputational harm is accompanied by deprivation of "a right previously held under state law"). The plaintiffs argue they state a claim for a "stigma plus" due process violation because of Matthew's

deprivation of a FAPE, an educational right that is guaranteed under the IDEA.

The Court does not reach the question of whether the "stigma plus" factor is adequately pleaded because the plaintiffs fail to make the predicate showing that any of the defendants caused them any reputational harm. For reasons stated infra Section III.C (dismissing defamation claims), there are no defamatory statements traceable to any of the named defendants. The plaintiffs fail to state a stigma-plus due process claim.

**D.   Equal Protection Claim**

The plaintiffs' equal protection claim relies on two different theories. First, the plaintiffs argue that because Matthew is male, he was treated differently from how a female victim in his situation would have been treated. Second, the plaintiffs make a "class of one" claim that the "government singled him out for differential treatment for reasons unique to him, rather than because of his membership in any group." Snyder v. Gaudet, 756 F.3d 30, 34 (1st Cir. 2014).

To prevail on either theory, the plaintiffs must show differential treatment relative to a similarly situated comparator. See id. at 34 (explaining that to state a "class of one" claim, a plaintiff "must show that he 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in

36

treatment'" (quoting <u>Vill. of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000))); <u>Freeman v. Town of Hudson</u>, 714 F.3d 29, 38 (1st Cir. 2013) ("An equal protection claim requires proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.").

The plaintiffs do not show any similarly situated comparator. The plaintiffs' equal protection claim is based entirely on how school officials might have treated a hypothetical, similarly situated female rape victim. Such conjecture does not suffice to state an equal protection claim. The plaintiffs also suggest that the Court could compare how the defendants treated Matthew and how they treated his assailants. Matthew is not similarly situated to the other students involved in the Camp Robindel rape. The plaintiffs fail to state an equal protection claim against either the individual or municipal defendants.

### E.   Supervisory Liability of Individual Defendants

The plaintiffs appear to argue that some of the individual defendants are subject to supervisory liability under section 1983 because they were deliberately indifferent to their subordinates' actions. Docket No. 40 at 6-9.

Supervisory liability under section 1983 has two elements. First, "the plaintiff must show that one of the supervisor's subordinates abridged the plaintiff's constitutional rights." Guadalupe-Baez v. Pesquera, 819 F.3d 509, 514 (1st Cir. 2016). Second, the plaintiff must show that "the [supervisor]'s action or inaction was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference." Id. at 515 (alterations in original) (quoting Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008)). "[A] supervisor may not be held liable under section 1983 on the tort theory of respondeat superior, nor can a supervisor's section 1983 liability rest solely on his position of authority. [T]he supervisor's liability must be premised on his own acts or omissions." Id.

Deliberate indifference requires a showing that the supervisor "had knowledge of facts" from which he or she could "draw the inference that a substantial risk of serious harm exists." Id. "Deliberate indifference alone does not equate with supervisory liability" because "[c]ausation remains an essential element." Id. Causation requires "proof that the supervisor's conduct led inexorably to the constitutional violation." Id. A plaintiff may prove causation by showing inaction in the face of

a "known history of widespread abuse sufficient to alert a supervisor to ongoing violations." Id.

The parties spar over whether the individual defendants were deliberately indifferent to students' behavior toward Matthew. Both parties miss the antecedent issue, which is that supervisory liability cannot be predicated on actions by students. First, it is plain that a student does not have a supervisor-subordinate relationship with a teacher or school administrator. Second, a student's actions cannot create the underlying constitutional infringement to support supervisory liability because of the lack of state action.

Supervisory liability may nonetheless exist as to individual defendants who encouraged or were deliberately indifferent to the actions of school district employees who infringed the plaintiffs' constitutional rights. The complaint alleges that Superintendent Tiano supervised A.D. Moreau and Principal Caliri. Compl. ¶ 7. The complaint also alleges that Principal Caliri directly supervised Dean Doherty and all teachers at CHS. Id. ¶ 8. Superintendent Tiano and Principal Caliri are the only two individual defendants alleged to have had supervisory roles. Id. ¶ 7-14. But for any supervisory liability to attach to either defendant, the complaint must allege acts or omissions by that supervisor rather than relying on a general theory of vicarious liability.

39

Plaintiffs have already adequately pleaded primary liability for First Amendment retaliation against Superintendent Tiano and Principal Caliri with respect to deliberate indifference to the sexual harassment of Matthew by fellow students. The question is whether the complaint also adequately alleges that Superintendent Tiano and Principal Caliri have supervisory liability for First Amendment retaliation. The plaintiffs argue that Superintendent Tiano and Principal Caliri knew that multiple teachers were making retaliatory comments about Matthew, but that Superintendent Tiano and Principal Caliri themselves retaliated against Matthew by being deliberately indifferent to the constitutional violations in a way that could be considered supervisory encouragement or condonation. But the complaint suggests that the administration did respond to reports of teachers' retaliatory comments. E.g., Compl. ¶ 105, 106, 112. While the plaintiffs argue that the administrators' response was inadequate, the Court's role is not to second-guess supervisory approaches. Rather, the question is whether the plaintiffs plead such deliberate indifference on the part of the supervisors that the supervisors themselves could be said to have engaged in constitutional misconduct. The plaintiffs fail to state a supervisory liability claim against Superintendent Tiano and Principal Caliri.

**F.    Qualified Immunity**

The individual defendants have asserted that they are
protected by the doctrine of qualified immunity. "[T]he
qualified immunity inquiry is a two-part test. A court must
decide: (1) whether the facts alleged or shown by the plaintiff
make out a violation of a constitutional right; and (2) if so,
whether the right was 'clearly established' at the time of the
defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d
263, 268-69 (1st Cir. 2009) (quoting Pearson v. Callahan, 555
U.S. 223, 232 (2009)). For purposes of the second step of that
analysis, whether the right in question was "clearly
established" depends on "(a) whether the legal contours of the
right in question were sufficiently clear that a reasonable
[government official] would have understood that what he was
doing violated the right, and (b) whether in the particular
factual context of the case, a reasonable [government official]
would have understood that his conduct violated the right."
Mlodzinski v. Lewis, 648 F.3d 24, 33 (1st Cir. 2011).

In recent years, the Supreme Court has published a number
of per curiam reversals of denials of qualified immunity,
emphasizing that "clearly established law" should not be defined
"at a high level of generality." White v. Pauly, 137 S. Ct. 548,
552 (2017) (per curiam) (quoting Ashcroft v. al-Kidd, 563 U.S.
731, 742 (2011)); Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)

41

(per curiam). While it does not require "a case directly on point" for law to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Mullenix, 136 S. Ct. at 308. The question is "whether the violative nature of particular conduct is clearly established," id. (quoting al-Kidd, 563 U.S. at 742), and it must be answered "in light of the specific context of the case, not as a broad general proposition, id. (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam)).

Two constitutional violations adequately pleaded against the individual defendants are: (1) violation of the First Amendment by public school teachers by singling out and mocking a student in front of a class, giving him an unjustifiably low grade, or giving him mean looks on multiple occasions in retaliation for that student having previously made a report of student-on-student sexual assault, and (2) violation of the First Amendment by public school administrators by ignoring a student's reports of bullying by other students and teachers, in retaliation for that student having previously made a report of student-on-student sexual assault. With respect to the first theory, the case law is clear that the teachers' harassment against a student in retaliation for reporting a sexual assault is impermissible retaliation in violation of the student's First Amendment rights. See, e.g., Seamons v. Snow, 84 F.3d 1226,

42

1238-39 (10th Cir. 1996) (holding that student's reporting of sexual hazing was entitled to First Amendment protection, and school officials were not entitled to qualified immunity when they punished him by throwing him off the football team).

The second theory is harder because the parties have cited no case law directly on point that supports the theory that deliberate indifference by school officials to sexual harassment and bullying by fellow students can be a retaliatory adverse action under the First Amendment. In other words, it is not clear under the existing case law whether inaction can be an adverse action rising to the level of retaliation in violation of the First Amendment.

Accordingly, the Court finds that qualified immunity applies to the claim that Dean Doherty, Superintendent Tiano, Principal Caliri, and A.D. Moreau engaged in First Amendment retaliation against Matthew by taking no action in response to his complaints about harassment by other students. The Court denies qualified immunity for the claim that Siragusa, Kender, and Cole engaged in First Amendment retaliation against Matthew by themselves harassing Matthew following the Camp Robindel incident.

### G.   **Monell** Liability

Under Monell v. Department of Social Services, a municipality may not be held liable under a theory of respondeat

superior for an employee's constitutional violation but it may
be held liable when "execution of [the municipality's] policy or
custom . . . inflict[ed] the injury." 436 U.S. 658, 694 (1978).
In other words, there must be "a direct causal link between a
municipal policy or custom and the alleged constitutional
deprivation." City of Canton, Ohio v. Harris, 489 U.S. 378, 385
(1989). "The 'official policy' requirement was intended to
distinguish acts of the municipality from acts of employees of
the municipality, and thereby make clear that municipal
liability is limited to action for which the municipality is
actually responsible." Pembaur v. City of Cincinnati, 475 U.S.
469, 479 (1986). "Official municipal policy includes the
decisions of a government's lawmakers, the acts of its
policymaking officials, and practices so persistent and
widespread as to practically have the force of law." Connick v.
Thompson, 563 U.S. 51, 61 (2011).

Under Massachusetts law, the school committee in each city
or town has policymaking authority. Armstrong v. Lamy, 938 F.
Supp. 1018, 1035 (D. Mass. 1996) (citing Mass. Gen. Laws ch. 71,
§ 37 ("The school committee in each city and town . . . shall
establish educational goals and policies for the schools in the
district . . . .")). A superintendent is not generally a
policymaker for the school committee. See Mass. Gen. Laws ch.
71, § 59 ("A superintendent . . . shall manage the system in a

fashion consistent with . . . the policy determinations of that
school committee . . . ."); McLaughlin v. City of Lowell, No.
CIV.A. 94-5069, 1998 WL 224929, at *13 (Mass. Super. Ct. Apr. 3,
1998) (Gants, J.) ("In short, the school committee makes policy;
the school superintendent and principals implement those
policies."). The question, then, is whether the CSC or the Town
engaged in any policymaking that violated the plaintiff's
constitutional rights.

The complaint does not point to any affirmative policy
decisions by the CSC or the Town that caused the injury. But
"[a] § 1983 plaintiff . . . may be able to recover from a
municipality without adducing evidence of an affirmative
decision by policymakers if able to prove that the challenged
action was pursuant to a state 'custom or usage.'" Pembaur v.
City of Cincinnati, 475 U.S. 469, 484 n.10 (1986). "There are
two requirements to prove a claim grounded on custom. First, the
custom or practice must be attributable to the municipality.
That is, it must be 'so well settled and widespread that the
policymaking officials of the municipality can be said to have
either actual or constructive knowledge of it yet did nothing to
end the practice.' Second, the custom must have been the cause
of and 'the moving force behind' the constitutional violation."
Whitfield v. Melendez-Rivera, 431 F.3d 1, 13 (1st Cir. 2005)

(quoting <u>Bordanaro v. McLeod</u>, 871 F.2d 1151, 1156 (1st Cir. 1989)).

The plaintiffs claim that Chelmsford schools had a custom of encouraging a win-at-all-costs sports culture that did not apply the same rules to star athletes, and that the municipality was aware of and perhaps even encouraged the culture. As a matter of formal policy, the CSC did implement a Bullying Intervention Plan in 2010 and entered into a Memorandum of Understanding with the Chelmsford Police to work together to respond to bullying. The plaintiffs allege that in practice, though, CSC had a practice of not applying its bullying policies and looking the other way from sexual misconduct and sexual harassment by star athletes. The plaintiffs allege that this culture was the moving force behind the First Amendment retaliation against Matthew by his teachers. The plaintiffs adequately plead municipal liability for First Amendment retaliation based on the role that municipal policy or custom allegedly played in the constitutional violation.

### H. Conspiracy to Violate Federal Constitutional Rights, Against Individual Defendants

A § 1983 conspiracy "as commonly defined is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict

a wrong against or injury upon another, and an overt act that results in damages.'" Estate of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008) (quoting Earle v. Benoit, 850 F.2d 839, 844 (1st Cir. 1988)). The plaintiffs cannot defeat a motion to dismiss based on conclusory allegations of conspiracy that are not supported by references to material facts. The plaintiffs plead no facts to support the existence of an agreement between parties to violate their federal constitutional rights, so they fail to cross the plausibility threshold.

## II.  **Federal Statutory Claims**

### A.    **Title IX (Count II, Against Municipal Defendants)**

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX provides an implied private right of action against the educational institution when sexual harassment is "sufficiently severe and pervasive to compromise or interfere with educational opportunities normally available to students" and "a school official authorized to take corrective action had actual knowledge of the harassment, yet exhibited deliberate indifference to it." Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65–66 (1st Cir. 2002).

47

"Discrimination on the basis of sex is the sine qua non of a Title IX sexual harassment case." Id. at 66. "[A] hostile environment claim based upon same-sex harassment is cognizable under Title IX," but the plaintiff must show that the harassment was "on the basis of sex." Id.; see also id. ("[T]he plaintiff must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but in fact constituted discrimination because of sex." (quoting Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 258 (1st Cir. 1999))).

Several cases in this circuit have addressed similar situations. In Morgan, a student claimed sexual harassment based on the fact that, among a number of bullying incidents that he suffered, there was one incident in which he had his pants pulled down in front of a girl. 823 F.3d at 745. He was also kicked, punched and verbally assaulted. Id. at 740. The First Circuit reasoned that "the pulling down of the pants by and large seems clearly to be an adjunct to the bullying on the basis of other considerations and by itself is not portrayed in the complaint as sufficiently 'severe' and/or 'pervasive' to supply a sexual harassment claim under Title IX." Id. at 745. Significantly, Morgan only involved one incident (pulling down pants) that could be deemed sex-based.

In Snelling v. Fall Mountain Reg'l Sch. Dist., No. CIV. 99-448-JD, 2001 WL 276975 (D.N.H. March 21, 2001), the District Court denied the defendants' motion for summary judgment based on evidence of sex-based harassment where the student was subjected to repeated homophobic name-calling and taunting because of the student's failure to meet sex-based expectations of masculinity. Id. at *4.

In Hankey v. Town of Concord-Carlisle, 136 F. Supp. 3d 52 (D. Mass. 2015), the district court allowed summary judgment for defendant school officials in a case involving extensive gender-neutral bullying and threats but only one sexually degrading epithet ("cunt"). However, the Court recognized the possibility that Title IX liability would attach where "repeated and pervasive sexual or gender-specific comments, epithets, and/or conduct . . . 'so poisoned the entire body of conduct towards Plaintiff' that a jury could reasonably view other facially neutral conduct directed at the plaintiff as sexual or gender-based as well." Id. at 68 (quoting O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1102 (10th Cir. 1999)).

Here there is evidence of extensive student-on-student sexual harassment for a whole school year following the Camp Robindel incident, including sexually degrading epithets: "Broomstick," "What's up with high school boys sticking stuff up each other's asses these days?," and whether Matthew "liked it

49

and if he wanted it again." While much of the bullying was gender-neutral, plaintiffs presented evidence of pervasive sexual taunting sufficient to constitute a hostile educational environment.

The municipal defendants argue that there is no evidence that the harassment was "based on sex," relying on Seamons. In Seamons, the plaintiff, a victim of a locker room sexual assault, objected to comments made by school officials that "boys will be boys" and that "he should take it like a man" in order to promote team loyalty and toughness. 84 F.3d at 1233. The Tenth Circuit ruled: "The fact that the coach, and perhaps others, described these qualities as they pertain to his situation in terms of the masculine gender does not convert this into sexual harassment." Id. But here, the alleged sexual taunting came in different forms from different students over an extended period of time, making the sexually charged hostile environment more repeated and pervasive. The plaintiffs adequately state a Title IX claim, at least at this early stage of the litigation.

## B.   IDEA Reimbursement (Count III, Against Municipal Defendants)

IDEA requires state or local agencies receiving federal IDEA funds to "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed

procedural safeguards with respect to the provision of free
appropriate public education by such agencies." 20 U.S.C.
§ 1415(a); see also Rose v. Yeaw, 214 F.3d 206, 209 (1st Cir.
2000). Among the required procedures is "[a]n opportunity for
any party to present a complaint . . . with respect to any
matter relating to the identification, evaluation, or
educational placement of the child, or the provision of a free
appropriate public education to such child." Id. § 1415(b)(6). A
parent who files such a complaint has the right to an "impartial
due process hearing" conducted by either the state or local
educational agency. Id. § 1415(f)(1). A parent has the right to
file a civil action in state or federal court only if he or she
remains aggrieved after the due process hearing. Id.
§ 1415(i)(2)(A).

A plaintiff does not have to exhaust administrative
remedies if he or she can show that "that the administrative
remedies afforded by the process are inadequate given the relief
sought." Frazier, 276 F.3d at 59; see also Rose, 214 F.3d at
210–11 ("A plaintiff does not have to exhaust administrative
remedies if she can show that the agency's adoption of an
unlawful general policy would make resort to the agency futile,
or that the administrative remedies afforded by the process are
inadequate given the relief sought. Similarly, exhaustion is not
required where the agency has prevented the litigant from

pursuing the administrative process."). The plaintiff seeking to invoke an exemption to exhaustion has the burden of showing that exemption applies. <u>Frazier</u>, 276 F.3d at 59.

The plaintiffs did not pursue any administrative remedies. On one occasion, the plaintiffs raised concerns about Kender's compliance with Matthew's IEP to Dean Doherty, and Dean Doherty suggested a peer tutor for Matthew. Otherwise, there is no allegation that the plaintiffs discussed any educational concerns with CHS or availed themselves of any IDEA procedures before enrolling him in private school. The plaintiffs argue that their failure to exhaust should be excused because "it would have been a futile matter where the Defendants didn't tell them they had IDEA rights." Docket No. 38 at 32. The plaintiffs also argue that they were more concerned about Matthew's safety than his IEP and that the application deadline for his private school was looming.

None of those excuses is convincing. The plaintiffs make no developed argument as to why Massachusetts's implementation of the IDEA requirements, Mass. Gen. Laws ch. 71B, was inadequate to remedy any FAPE deprivation. They do not meet their burden by claiming in a conclusory manner than IDEA procedures would have been futile. There are sound reasons for enforcing the IDEA exhaustion requirement. "The IDEA's administrative machinery places those with specialized knowledge -- education

professionals -- at the center of the decisionmaking process, entrusting to them the initial evaluation of whether a disabled student is receiving a free, appropriate public education. These administrative procedures also ensure that educational agencies will have an opportunity to correct shortcomings in a disabled student's individualized education program." Frazier, 276 F.3d at 60-61. The plaintiffs fail to state an IDEA claim.

## III. State Law Claims

### A. Massachusetts Declaration of Rights (Count VI, Against Individual Defendants)

The plaintiffs claim that the individual defendants' conduct violated their state constitutional rights. Courts have held that in most circumstances, plaintiffs may not bring direct claims under the state constitution but must instead bring a claim under the Massachusetts Civil Rights Act, Mass. Gen. Laws Ann. ch. 12, § 11I. See Martino v. Hogan, 643 N.E.2d 53, 59-60 (Mass. App. Ct. 1994); see also Grubba v. Bay State Abrasives, Div. of Dresser Indus., Inc., 803 F.2d 746, 748 (1st Cir. 1986). The Massachusetts Civil Rights Act provides an adequate procedural vehicle, and it is raised as a cause of action in Counts VII and VIII. The plaintiffs fail to state a cause of action under the Massachusetts Declaration of Rights.[3]

---

[3]     The plaintiffs ask that Count VI be dismissed without prejudice, since they claim that the law in this area is novel

**B.   Massachusetts Civil Rights Act (Count VII and VIII, Against Individual Defendants)**

"To establish a claim under the [Massachusetts Civil Rights Act ('MCRA')], the plaintiffs must prove that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" Swanset Dev. Corp. v. City of Taunton, 668 N.E.2d 333, 337 (Mass. 1996); see also Mass. Gen. Laws ch. 12, § 11I. "[T]he MCRA is narrower than § 1983 in that it limits its remedy to conduct that interferes with a secured right 'by threats, intimidation or coercion.' . . . The Massachusetts legislature intended that even a direct deprivation of a plaintiff's rights 'would not be actionable under the act unless it were accomplished by means of one of these three constraining elements.'" Nolan v. CN8, 656 F.3d 71, 76–77 (1st Cir. 2011) (quoting Buster v. George W. Moore, Inc., 783 N.E.2d 399, 409 (Mass. 2003)).

"In the context of the [MCRA], a 'threat' consists of the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct.

---

and still developing, but they provide no supporting authority for that statement. The dismissal of Count VI is with prejudice.

'Coercion' is the application to another of such force, either
physical or moral, as to constrain him to do against his will
something he would not otherwise have done." Haufler v. Zotos,
845 N.E.2d 322, 335 (Mass. 2006). The standard is objective:
"whether a reasonable person in [the plaintiff's] circumstance
would feel threatened, intimidated or coerced by [the
defendant's] conduct." Meuser v. Fed. Express Corp., 564 F.3d
507, 520 (1st Cir. 2009) (citing Commonwealth v. DeVincent, 266
N.E.2d 314, 316 (Mass. 1971)).

In support of the MCRA claim, the plaintiffs raise the same
federal constitutional rights alleged to have been violated in
the § 1983 claims. In addition, the plaintiffs, citing McDuffy
v. Sec'y of Exec. Office of Educ., 615 N.E.2d 516, 555 (Mass.
1993), claim that Matthew was deprived of a state constitutional
right to a public education.

The plaintiffs adequately state a claim for deprivation of
constitutional rights by moral coercion by Siragusa and Kender.
The question is whether the alleged actions by those defendants
rose to the level that would have intimidated a reasonable
fifteen-year-old student in Matthew's position to refrain from
doing something against his will. The strongest allegation is
that Matthew's teachers ridiculed him in front of other students
for having "snitched" to the police. While there were no threats
of physical injury or harm, a fifteen-year-old could reasonably

have been intimidated from continuing to speak up about future incidents of harassment. There is also a plausible allegation that Matthew left CHS and was deprived of a state right to education because of moral coercion by the Siragusa and Kender. No plausible MCRA claim is stated against any of the other individual defendants.

The plaintiffs fail to state a claim for conspiracy to violate the MCRA. "To prove their claims for civil conspiracy, the plaintiffs must show an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement." Bartle v. Berry, 953 N.E.2d 243, 253 (Mass. App. Ct. 2011). The complaint does not adequately plead that the individual defendants acted in concert to violate Matthew's federal or state constitutional rights by threat, intimidation or coercion. The plaintiffs fail to state an MCRA conspiracy claim.

### C.   Defamation (Count IX, Against Individual Defendants)

"To prevail on a claim of defamation, a plaintiff must establish that the defendant was at fault for the publication of a false statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss." White v. Blue Cross & Blue Shield of Mass., Inc., 809 N.E.2d 1034, 1036 (Mass. 2004). "The element of publication is

satisfied where the defamatory communication is transmitted to
even one person other than the plaintiff." Phelan v. May Dep't
Stores Co., 819 N.E.2d 550, 554 (Mass. 2004). To be defamatory,
the statement must be "of and concerning" the plaintiffs. Eyal
v. Helen Broadcasting Corp., 583 N.E.2d 228, 230 (Mass. 1991).
"In Massachusetts, the test whether [an alleged defamatory
statement] is of and concerning the plaintiff is met by proving
either (1) that the defendant intended the words to refer to the
plaintiff and that they were so understood or (2) that persons
could reasonably interpret the defendant's words to refer to the
plaintiff and that the defendant was negligent in publishing
them in such a way that they could be so understood." HipSaver,
Inc. v. Kiel, 984 N.E.2d 755, 766 (Mass. 2013) (quoting ELM Med.
Lab., Inc. v. RKO Gen., Inc., 532 N.E.2d 675 (Mass. 1989)). An
expression of pure opinion may not for the basis of a defamation
claim. Id. at 765 n.11.

The plaintiffs raise the following statements as being
defamatory: "the matter was not serious 'a juvenile nature,'
denying a rape occurred, claiming Matt lied and that he made
everything up, and denying the results of the [New Hampshire]
proceedings knowing in fact how the matters were resolved."
Docket No. 40 at 19.

None of those statements are actionable as defamation
against the named defendants. Statements that the Camp Robindel

incident was of "a juvenile nature" were made to media sources by unnamed sources, and the complaint alleges no basis other than speculation to trace the words to any of the individual defendants. As to statements denying the Camp Robindel incident and claiming that Matthew was lying, the complaint does not actually allege an instance when a defendant made such a statement. Students at the school allegedly said that Matthew was a liar, and the families of K.M., G.C., and Z.D. issued a press release denying the Camp Robindel incident. But none of them is a defendant. Denial of the results of the New Hampshire proceedings were alleged to have been made by Lisa Vecchione, whose relationship to the case is unclear from the complaint other than that she is the sister of defendant Moreau, and Salvatore Lupoli, a member of the CSC who is not named as an individual defendant. See Howard v. Town of Burlington, 506 N.E.2d 102, 105 (Mass. 1987) ("The general respondeat superior test involving intentional torts considers whether the act was within the course of employment, and in furtherance of the employer's work."). But the complaint makes no allegations about what capacity Lupoli was speaking in. The defamation claim is dismissed as to all defendants.

### D. Intentional Infliction of Emotional Distress (Count X, Against Individual Defendants)

To make out an intentional infliction of emotional distress claim, a plaintiff must show: "(1) that the defendant intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of the conduct, (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community, (3) that the actions of the defendant were the cause of the plaintiff's distress, and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable person could be expected to endure.'" Conway v. Smerling, 635 N.E.2d 268, 273 (Mass. 1994) (quoting Agis v. Howard Johnson Co., 355 N.E.2d 315 (Mass. 1976)). Outrageous means "a high order of reckless ruthlessness or deliberate malevolence that . . . is simply intolerable." Id. "Thus, liability cannot be predicated upon mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities, nor even is it enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Foley v. Polaroid Corp., 508

N.E.2d 72, 82 (Mass. 1987). "There is an issue for the jury if reasonable people could differ on whether the conduct is 'extreme and outrageous.'" Boyle v. Wenk, 392 N.E.2d 1053, 1056–57 (Mass. 1979).

As with other claims in this case, it is necessary to parse out the allegations against each individual defendant. The plaintiffs make plausible claims against Siragusa and Kender, the teachers who allegedly ridiculed a boy in front of his classmates for reporting a sexual assault to the police and school officials. While Cole also allegedly acted inappropriately as a teacher by making derogatory comments about the incident, his conduct was not as extreme or outrageous because his "pole" comment was made outside the presence of Matthew. Nor do allegations about Cole giving mean looks to Matthew rise to the level of extreme and outrageous. No extreme and outrageous conduct is adequately pleaded as to any of the other individual defendants.

### E. Negligence (Count XIII, Against Municipal Defendants), Negligent Infliction of Emotional Distress (Count XI, Against Municipal Defendants)

For both the negligence claim (Count XIII) and the negligent infliction of emotional distress claim (Count XI), the threshold question is whether Massachusetts law allows the municipal defendants to be susceptible to the tort claim.

The Massachusetts Tort Claims Act ("MTCA"), Mass. Gen. Laws ch. 258, is a limited waiver of sovereign immunity for torts by public employees. Under the MTCA, "public employers" are liable for "injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances." Mass. Gen. Laws ch. 258, § 2.

At the outset, the CSC argues that it cannot be subject to a tort action because it is not a "public employer" within the meaning of the MTCA. The MTCA's definition of "public employer" states that "[w]ith respect to public employees of a school committee of a city or town, the public employer for the purposes of this chapter shall be deemed to be said respective city or town." Mass. Gen. Laws ch. 258, § 1. Under that provision, the Town is properly named as a public employer defendant but the CSC is not.

The liability of a public employer under section 2 of the MTCA is subject to several exclusions, listed in Mass. Gen. Laws ch. 258, § 10. The Town invokes the exclusion in section 10(j), under which it retains immunity from suit for claims "based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent

or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer." Id. § 10(j). The Town argues that because of that section, it cannot be held liable for failing to prevent student-on-student bullying that is "not originally caused by" the Town.

The Supreme Judicial Court has "construed the 'original cause' language to mean an affirmative act (not a failure to act) by a public employer that creates the 'condition or situation' that results in harm inflicted by a third party." Kent v. Commonwealth, 771 N.E.2d 770, 775 (Mass. 2002) (citing Brum v. Dartmouth, 704 N.E.2d 147, 154–55 (Mass. 1999)). An affirmative act of a public employer is the "original cause" of a "condition or situation" that results in harmful consequences only if the act "materially contributed to creating the specific 'condition or situation' that resulted in the harm." Id. at 775–76.

The plaintiffs argue that their negligence-based claims against the Town can proceed for two reasons. First, they argue that the "sports culture" custom, as well as the individual defendants' treatment of Matthew, was the "original cause" that emboldened CHS students to bully Matthew without fear of discipline. Second, the plaintiffs point to the exception to the exclusion in section 10(j)(1), which allows a plaintiff to

recover on "any claim based upon explicit and specific assurances of safety or assistance, beyond general representations that investigation or assistance will be or has been undertaken . . . provided that the injury resulted in part from reliance on those assurances." Mass. Gen. Laws ch. 258, § 10(j)(1).

Matthew's negligence claims survive dismissal. Matthew adequately pleads that the original cause of the injuries he suffered was an affirmative act by the school that placed him in an unsupervised overnight sports environment with known bullies. Once the municipality is shown to be the "original cause" of the injury, then a negligence action can be maintained for a subsequent "act or failure to act to prevent or diminish the harmful consequences of . . . violent or tortious conduct of a third person." Mass. Gen. Laws ch. 258, § 10(j). The Town cites a number of decisions in which a court found that a municipality was immune from suit for failing to prevent student-on-student harassment. See Harrington v. City of Attleboro, 172 F. Supp. 3d 337, 348-49 (D. Mass. 2016); Hankey, 136 F. Supp. 3d at 75; Doe v. Bradshaw, No. CIV.A. 11-11593-DPW, 2013 WL 5236110, at *12 (D. Mass. Sept. 16, 2013); Parsons ex rel. Parsons v. Town of Tewksbury, No. 091595, 2010 WL 1544470, at *4 (Mass. Super. Ct. Jan. 19, 2010). Those cases are distinguishable because none of those cases involved allegations that the school took

affirmative actions to sponsor an off-campus athletic camp supervised by school personnel.

The plaintiffs also rely on section 10(j)(1) to survive dismissal under the MTCA. The municipal defendants made explicit and specific assurances of safety or assistance to Matthew after the rape. Under section 10(j)(1), "by 'explicit' the Legislature meant a spoken or written assurance, not one implied from the conduct of the parties or the situation, and by 'specific' the terms of the assurance must be definite, fixed, and free from ambiguity." Lawrence v. City of Cambridge, 664 N.E.2d 1, 3 (Mass. 1996). Superintendent Tiano's statement that "We have teachers in the hallways that monitor things and he will be fine," Compl. ¶ 100, meets that standard.

The Town correctly argues that there is a separate limitation on Matthew's ability to argue that the Town's failure to act to prevent bullying was negligent. The discretionary function exclusion in section 10(b) retains immunity for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused." Mass. Gen. Laws ch. 258, § 10(b). Courts have clarified that the discretionary function exclusion is designed to immunize "policy-making or planning," as opposed to

"merely operational" actions. <u>Morgan v. Driscoll</u>, No. CIV.A.
9810766-RWZ, 2002 WL 15695, at *7 (D. Mass. Jan. 3, 2002)
(citing <u>Alake v. City of Boston</u>, 666 N.E.2d 1022, 1024 (Mass.
App. Ct. 1996) ("Decisions that require some discretion, but
that do not involve social, political, or economic policy
considerations are not immunized by § 10(b).")). A negligence
suit concerning the school's failure to carry out its
operational policy regarding how to protect students from
bullying, for example, is not barred.

While the negligent infliction of emotional distress claim
survives the MTCA to that same extent, the plaintiffs must plead
that they suffered physical harm resulting from the emotional
distress. To recover for the tort of negligent infliction of
emotional distress, a plaintiff must prove: "(1) negligence; (2)
emotional distress; (3) causation; (4) physical harm manifested
by objective symptomatology; and (5) that a reasonable person
would have suffered emotional distress under the circumstances
of the case." <u>Payton v. Abbott Labs</u>, 437 N.E.2d 171, 181 (Mass.
1982); <u>see also</u> <u>Rodriguez v. Cambridge Hous. Auth.</u>, 823 N.E.2d
1249, 1253 (Mass. 2005) (confirming that physical harm
requirement persists). The plaintiffs have failed to plead any
resulting physical harm manifested by objective symptomatology.

In any event, Matthew's parents would not be able to
recover for negligent infliction of emotional distress because

they fail the proximity requirement. Massachusetts law does not require that a relative claiming negligent infliction of emotional distress was at the scene of the harm to a family member, but it does require that "the shock follow[] closely on the heels of the accident." Stockdale v. Bird & Son, Inc., 503 N.E.2d 951, 953 (Mass. 1987) (quoting Ferriter v. Daniel O'Connell's Sons, 413 N.E.2d 690, 697 (Mass. 1980)). That requirement has been strictly applied. See Stockdale, 503 N.E.2d 953 (holding that a mother who did not see son's injured body until twenty-four hours after an accident at funeral home was not entitled to recover); Cohen v. McDonnell Douglas Corp., 450 N.E.2d 581, 589-90 (Mass. 1983) (holding that mother who did not learn of her son's death in airplane crash until seven hours after the crash could not recover); Miles v. Edward O. Tabor, M.D., Inc., 443 N.E.2d 1302, 1305-06 (Mass. 1982) (holding that a mother who suffered emotional distress as the result of a doctor's negligence at her son's birth, which led to the son's death two months later, did not have a cause of action). Under that standard, Matthew's parents fail to satisfy the proximity requirement for bringing a negligent infliction of emotional distress claim.

**F.   Civil Conspiracy (Count XII, Against Individual
Defendants)**

"To establish a civil conspiracy, a plaintiff must
demonstrate that 'a combination of persons [acted] pursuant to
an agreement to injure the plaintiff.'" Gutierrez v. Mass. Bay
Transp. Auth., 772 N.E.2d 552, 568 (Mass. 2002) (quoting J.R.
Nolan & L.J. Sartorio, Tort Law § 99, at 136 (2d ed. 1989)); see
also Berdell v. Wong, 46 N.E.3d 115 (table), 2016 WL 767610, at
*3 (Mass. App. Ct. 2016) ("In order to establish a civil
conspiracy, a plaintiff must show 'a common design or an
agreement, although not necessarily express, between two or more
persons to do a wrongful act and, second, proof of some tortious
act in furtherance of the agreement.'" (quoting Aetna Cas. Sur.
Co. v. P & B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994)).

The complaint alleges that individual defendants acted in
concert with the families of K.M., G.C., and Z.D. to injure
Matthew. The complaint does not allege any specifics about this
agreement, except that the families' spokesperson is involved
with a nonprofit organization that supports the CPS. That is not
a plausible basis for conspiracy. The plaintiffs cannot defeat a
motion to dismiss based on conclusory allegations of conspiracy
that are not supported by references to material facts. The
plaintiffs plead no facts to support the existence of an

agreement to injure Matthew. The plaintiffs fail to state a
civil conspiracy claim.

G.   **Loss of Consortium (Count XIV, Against All Defendants)**

Massachusetts provides a statutory cause of action for a
parent to recover consortium damages when their parental
relationship is impacted by serious "injuries" to a minor or
dependent child at the hands of a tortfeasor. Mass. Gen. Laws
ch. 231, § 85X. Consortium claims are derivative in nature, so
it requires an underlying tortious act. See Mouradian v. Gen.
Elec. Co., 503 N.E.2d 1318, 1321 (Mass. App. Ct. 1987)
(considering common law spousal consortium claim).

The municipal defendants argue that the consortium statute
only contemplates recovery from a "person." See Mass. Gen. Laws
ch. 231, § 85X ("The parents of a minor child or an adult child
who is dependent on his parents for support shall have a cause
of action for loss of consortium of the child who has been
seriously injured against any person who is legally responsible
for causing such injury."). The statutory definition in Mass.
Gen. Laws ch. 4, § 7 -- which applies to all Massachusetts
statutes -- states that the term "person" "shall include
corporations, societies, associations and partnerships," but it
does not mention municipalities or government entities.

A plain textual reading of Section 85X does not allow
recovery from the municipal defendants. Harrington, 172 F. Supp.

3d at 354–55 ("Though Massachusetts appellate courts have not yet addressed whether a town is a 'person' under the loss of consortium statute, they have decided that other statutes using the word 'person' do not include governmental entities." (quoting Doe, 2013 WL 5236110, at *14). The plaintiffs point to one contrary authority that specifically addresses the term "person" in section 85X, a Massachusetts Superior Court opinion that reasoned: "The Legislature is presumed to have known the provisions of G.L. c. 258, § 2, enacted in 1978, and the decisions interpreting these provisions when it passed G.L. c. 231, § 85X in 1989. Specifically, it was aware that since the abrogation of sovereign immunity with the passage of c. 258, municipalities would be liable in tort 'to the same extent as a private individual.' Moreover, the Legislature did not attempt to expressly exempt municipalities from c. 231, § 85X's provisions." Cavanaugh v. Tantasqua Reg'l Sch. Dist., No. WOCV201101797A, 2012 WL 676058, at *2 (Mass. Super. Ct. Feb. 14, 2012). That opinion is unpersuasive, since by that logic the Massachusetts legislature also ought to have been aware of the general statutory definition for "person" in Mass. Gen. Laws ch. 4, § 7 that far predates the enactment of section 85X. See Long v. Co-operative League of Am., 140 N.E. 811, 812 (Mass. 1923) ("It is provided by G. L. c. 4, § 7, cl. 23, that in construing statutes, unless inconsistent with the manifest intent of the

Legislature or repugnant to its context, the word 'person' shall include 'corporations, societies, associations and partnerships.'"). The plaintiffs fail to state a consortium claim against the municipal defendants. The plaintiffs do state a claim with respect to Siragusa and Kender, against whom they adequately pleaded intentional infliction of emotional distress.

### ORDER

The Court **ALLOWS** in part and **DENIES** in part the motions to dismiss (Docket Nos. 28, 30).

On Count I, a § 1983 claim against the municipal defendants, the plaintiffs fail to state a claim for violations of substantive due process, the Equal Protection Clause, and procedural due process. The municipal defendants' motion to dismiss, however, is **DENIED** to the extent that the plaintiffs state a <u>Monell</u> claim for First Amendment retaliation against the municipal defendants.

On Count II, a Title IX claim against the municipal defendants, the municipal defendants' motion to dismiss is **DENIED**.

On Count III, an IDEA claim against the municipal defendants, the municipal defendants' motion to dismiss is **ALLOWED**.

On Count IV, a § 1983 claim against the individual defendants, the plaintiffs fail to state a claim for violations

of substantive due process, the Equal Protection Clause, and procedural due process. The plaintiffs state a claim for First Amendment retaliation by defendants Tiano, Moreau, Caliri, Doherty, Siragusa, Kender, and Cole, but not by Rich. The Court allows qualified immunity as to Tiano, Moreau, Caliri, and Doherty as to the retaliation claim but denies qualified immunity as to Siragusa, Kender, and Cole. The individual defendants' motion to dismiss is **ALLOWED** as to Tiano, Moreau, Caliri, Doherty, and Rich but **DENIED** as to Siragusa, Kender, and Cole.

On Count V, a § 1983 conspiracy claim against the individual defendants, the individual defendants' motion to dismiss is **ALLOWED**.

On Count VI, a claim for violation of the Massachusetts Declaration of Rights against the individual defendants, the individual defendants' motion to dismiss is **ALLOWED**.

On Count VII, a claim for violation of the Massachusetts Civil Rights Act against the individual defendants, the individual defendants' motion to dismiss is **DENIED** as to Siragusa and Kender, but otherwise **ALLOWED**.

On Count VIII, a claim for conspiracy to violate the Massachusetts Civil Rights Act against the individual defendants, the individual defendants' motion to dismiss is **ALLOWED**.

On Count IX, a claim for defamation against the individual defendants, the individual defendants' motion to dismiss is **ALLOWED**.

On Count X, a claim for intentional infliction of emotional distress against the individual defendants, the individual defendants' motion to dismiss is **DENIED** with respect to Siragusa and Kender, but otherwise **ALLOWED**.

On Count XI, a claim for negligent infliction of emotional distress against the municipal defendants, the municipal defendants' motion to dismiss is **ALLOWED**.

On Count XII, a claim for civil conspiracy against the individual defendants, the individual defendants' motion to dismiss is **ALLOWED**.

On Count XIII, a claim for negligence against the municipal defendants, the municipal defendants' motion to dismiss is **ALLOWED** as to the CSC but **DENIED** as to the Town.

On Count XIV, a claim for loss of consortium against all defendants, the municipal defendants' motion to dismiss is **ALLOWED**. The individual defendants' motion to dismiss is **DENIED** as to Siragusa and Kender, but otherwise **ALLOWED**.

In sum, the Court dismisses all claims against Tiano, Caliri, Moreau, Doherty, and Rich.

The surviving claims against the Town and/or CSC are Count I (First Amendment retaliation), Count II (Title IX) and Count XIII (negligence).

The surviving claims against the individual defendants Siragusa and Kender are Count IV (First Amendment retaliation), Count VII (MCRA), Count X (intentional infliction of emotional distress), and Count XIV (loss of consortium).

The surviving claim against the individual defendant Cole is Count IV (First Amendment retaliation).

/s/ PATTI B. SARIS_____
Patti B. Saris
Chief United States District Judge